IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Securian Financial Group, Inc. and<br>Minnesota Life Insurance Company,<br><br>Plaintiffs,<br><br>v.<br><br>Wells Fargo Bank, N.A.,<br><br>Defendant. | Case No.<br><br><br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Minnesota Life Insurance Company ("Minnesota Life") and the Advantus Series Fund, Inc. ("the Series Fund") were and are clients of Defendant Wells Fargo Bank, N.A.'s ("Wells Fargo's") securities lending program. In connection with the operation of that program, Wells Fargo breached contractual, fiduciary, and other legal duties to Minnesota Life and the Series Fund. These breaches caused Minnesota Life and the Series Fund approximately $40 million in damages. For the protection of the Series Fund's investors and Minnesota Life's policyholders and contract holders, Securian Financial Group, Inc. ("Securian"), which is Minnesota Life's parent, reimbursed certain losses that Wells Fargo caused to Minnesota Life and the Series Fund in exchange for an assignment of claims against Wells Fargo.

Securian and Minnesota Life now bring this suit in order to prevent Wells Fargo from further injuring the public through its deceptive and unlawful practices and to hold Wells Fargo accountable for the tremendous damages its actions inflicted upon Securian,

Minnesota Life, the Series Fund, and their respective investors and policyholders. For their Complaint against Wells Fargo, Securian and Minnesota Life state and allege as follows:

## INTRODUCTION

1.      Minnesota Life and the Series Fund were clients of Wells Fargo's securities lending program. Securities lending is a transaction whereby securities are loaned in exchange for collateral and a fee. The collateral is invested to earn an additional return to the lender of the securities. Among other things, Wells Fargo agreed in writing to invest its clients' collateral only in safe, liquid investments. In addition, it promised Minnesota Life that it would make "no investment . . . in any obligation, or other evidence of indebtedness of any business entity not organized under the laws of the United States or any state thereof, or the Dominion of Canada thereof." And it promised that all investments of Series Fund collateral would "conform to, and be consistent with, both the Collateral Guidelines for Securities Lending . . . and the Fund's then current Prospectus and Statement of Additional Information" ("SAI") on file with the United States Securities and Exchange Commission ("SEC").

2.      At some point, Wells Fargo began ignoring its promises. In order to increase its own profits, Wells Fargo began prioritizing investment yield over safety and liquidity. Wells Fargo began investing in foreign "structured investment vehicles" ("SIVs"), including Ireland-based Cheyne Finance and Cayman Islands-based Victoria Finance. SIVs borrow money in the short term and invest in long-term obligations, such as mortgage loans and consumer debt. By their nature, SIVs require a steady flow of new

investment. If the pace of new investment slows or if the underlying debts default, the SIV will default on its obligations to earlier investors. As a result, SIVs were not safe, liquid, or otherwise appropriate investments for the securities lending program. By mid-2007, Wells Capital Management ("Wells Capital")—the internal investment adviser that advised Wells Fargo's securities lending group—recommended that Wells Fargo eliminate investments in Cheyne Finance and Victoria Finance from conservative portfolios. In response, Wells Fargo's proprietary money market portfolios liquidated or reduced their positions in Cheyne Finance and Victoria Finance. Wells Fargo's securities lending group ignored Wells Capital's warnings. In late 2007 and early 2008, Cheyne Finance and Victoria Finance defaulted, and their notes plummeted in value.

3.      In addition to foreign SIVs, Wells Fargo invested significant amounts of Minnesota Life's securities lending collateral in corporate bonds issued by Lehman Brothers. In the spring of 2008, Wells Capital warned internally that Lehman Brothers was at risk of default. In response, Wells Fargo's proprietary money market portfolios liquidated or reduced their positions in Lehman Brothers. Again, the securities lending program ignored Wells Capital's warnings. Lehman Brothers filed for bankruptcy protection on September 15, 2008, and the value of its corporate bonds dropped precipitously.

4.      All told, Minnesota Life and the Series Fund lost nearly $40 million as a result of Wells Fargo's decisions to invest in and hold Cheyne Finance, Victoria Finance, and Lehman Brothers. All of these losses would have been avoided if Wells Fargo had fulfilled its contractual, fiduciary, and other obligations to its clients.

5.     This is not the first lawsuit against Wells Fargo for breaching duties to securities lending clients. Last year, a Minnesota jury found that Wells Fargo had breached its duties to its securities lending clients and violated Minnesota law. That court found independently that "Wells Fargo breached its fiduciary duties of good faith, loyalty, fidelity, fair dealing, and full disclosure." The court further found as follows:

> . . . I conclude that Wells Fargo breached its duty of full disclosure by not adequately disclosing that it was changing the risk profile of the securities lending program, that it breached its duty of impartiality by favoring certain participants over other participants, and that it breached its duty of loyalty by advancing the interest of the borrowing brokers to the detriment of one or more of the Plaintiffs. . . .

> Plaintiffs have established that Wells Fargo made profound errors and mistakes in the conduct of its securities lending program resulting, I conclude, from years of unreasonable management complacency, if not hubris. The evidence demonstrates that Wells Fargo's management considered the program a business backwater. As a result, the program was ignored. . . .

> There is no doubt from the evidence, both documentary and testimonial, that Wells Fargo was fully aware of the increased risk it was injecting into the securities lending program, that its line managers were not reasonably managing that risk, and that its actions and inactions had the potential for inflicting enormous harm on Plaintiffs. Wells Fargo's attitudes and conduct, after it became apparent that the securities lending program was in trouble, was primarily to shield itself, and its favored customers from the consequences.

Wells Fargo likewise breached its fiduciary and other legal duties to Minnesota Life and the Series Fund in myriad ways.

## THE PARTIES

6.      Securian is an insurance, financial products, and financial services firm. Securian is a Delaware corporation with its principal place of business in St. Paul, Minnesota. Securian is the parent company of Minnesota Life.

7.      Minnesota Life is an insurance, pension, and investment products firm. Minnesota Life is a Minnesota corporation with its principal place of business in St. Paul Minnesota. Minnesota Life owns all of the shares of Advantus Series Fund, Inc. ("the Series Fund"), which is a registered investment company under the Investment Company Act of 1940. The Series Fund offers various fixed income and equity investment portfolios to life insurance companies to fund annuity contracts and life insurance policies. The Series Fund is comprised of seven portfolios: a Money Market Portfolio, a Bond Portfolio, an International Bond Portfolio, a Mortgage Securities Portfolio, an Index 400 Mid-Cap Portfolio, an Index 500 Portfolio, and a Real Estate Securities Portfolio. Advantus Capital Management ("Advantus"), which is wholly owned by Securian, manages the Series Fund's investment portfolios.

8.      Wells Fargo is a national banking association. Wells Fargo's articles of association designate Sioux Falls, South Dakota as its main office and principal place of business. Wells Fargo is one of the five largest banks in the United States. It has more than 250,000 employees and more than 70 million customers. Wells Fargo is the successor to Norwest Corporation, Norwest Bank, Minnesota, N.A., and Wells Fargo Bank Minnesota, N.A., among others. As used herein, references to "Wells Fargo" refers

both to Wells Fargo and to its predecessors. As relevant to this case, Wells Fargo served as agent for securities lending to Minnesota Life and the Series Fund.

## JURISDICTION AND VENUE

9.      Minnesota Life and Securian are citizens of Delaware and Minnesota. Wells Fargo is a citizen of South Dakota. *See* 28 U.S.C. § 1348. The amount in controversy, excluding interest and costs, exceeds $75,000. This Court has subject matter jurisdiction under 28 U.S.C. § 1332.

10.     This Court has personal jurisdiction over Wells Fargo because Wells Fargo regularly conducts business in Minnesota; Wells Fargo's securities lending group is based in Minnesota; the contracts at issue in this case were executed in Minnesota and are governed by Minnesota law; and the conduct that forms the basis of the present action—including virtually every relevant communication and meeting between the parties—occurred in Minnesota.

11.     Venue is proper in this Court because a substantial part of the acts and omissions upon which this action is based occurred within this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### Securities Lending

12.     Securities lending is a transaction whereby a security, such as a stock or bond, is loaned by one party ("the Lender") to another, usually a broker-dealer ("the Borrower"). The Borrower typically borrows securities for a period of time for one of several purposes, such as to facilitate delivery of a trade or to engage in short selling (wherein borrowed securities are sold with the expectation they can later be repurchased

at lower prices to create a profit). For the protection of the Lender, the Borrower must typically provide highly liquid collateral such as cash or government bonds worth between 102% and 105% of the value of the loaned security. The collateral must be "marked to market" on a daily basis, meaning the amount of collateral provided by the Borrower must be increased or decreased daily in order to keep pace with the market value of the loaned security.

13.     Lenders earn money from securities lending in two ways:

a.   First, the Borrower may pay a fee for the use of the loaned security. That fee will typically be quoted as an annualized percentage of the value of the loaned security. When a given security is in high demand for purposes such as short selling, the fee the Borrower pays will be relatively high. When a given security is not in high demand, the fee earned for lending that security will be relatively low.

b.   Second, Lenders gain access to the Borrower's highly liquid collateral, which may be invested during the term of the loan in order to generate additional returns. The amount of money generated by investment of cash collateral is determined by the rate of return on the investment.

14.     Securities lending is typically facilitated by a securities lending agent ("the Agent"). The Agent facilitates loans of securities and manages the investment of collateral for the benefit of the Lender according to guidelines set out in an agreement between the Lender and Agent. The Agent earns a fee for its services in the form of a

percentage of the total profits earned by loaning securities and by investing the collateral. This fee is called the Agent's "split."

15.     Lenders generally require that securities lending collateral be invested only in high-quality, low-risk, money market instruments that provide a modest rate of return. This is because, upon termination of a securities loan, the securities lender must return the collateral to the Borrower before the security may be returned to the Lender. If collateral is unavailable upon termination of a securities loan, such as if the collateral has been lost on a risky investment or is tied up in an illiquid investment, the Lender must reimburse the collateral out-of-pocket in order to unwind the securities loan and retake possession of the loaned securities. As a result, an Agent is typically prohibited by contract and investment guidelines from investing collateral in illiquid or risky investments. This is true, even though the Agent might increase its profits by putting the Lender's money into higher-risk, higher-return investments, or into illiquid, longer-maturity investments.

**Wells Fargo's Securities Lending Program**

16.     Wells Fargo offered services as a securities lending agent beginning in 1982.

17.     Wells Fargo has promoted its securities lending program as a means to "[p]rovide [an] additional source of revenue which helps beat performance benchmarks and expense ratios" and as a way for securities owners to "[o]ffset trustee/custodial fees."

18.     Wells Fargo has repeatedly claimed that its securities lending program is safe. It has claimed to have implemented various "safeguards against investment risk."

Among other things, Wells Fargo has claimed to invest collateral only in "approved top tier investments." It has claimed that its in-house "credit analyst develops [a] pre-approved list" of investments for its securities lending program. Wells Fargo has claimed to offer "[a]sset/liability management for [clients'] protection," and it has claimed to have "[p]rocedures in place to use if necessary to liquidate collateral and credit client accounts."

19.     Wells Fargo has touted its ability to help clients earn reasonable returns from its securities lending program without taking significant risk. For example, in a March 3, 2003 Proposal for Securities Lending Services, Wells Fargo stated as follows:

> NO NEED TO STRETCH FOR YIELD. Because of Wells Fargo's volume, capacity, and queuing advantages, we manage the securities lending portfolio to maximize earnings, while taking minimal risk. We use a professional credit analysis team to evaluate commercial paper programs and develop an approved list of eligible investments. We also use a professional money manager with a CFA designation to manage the cash collateral. Our ability to match term loans with investments has stabilized our outstanding loan balances during volatile market conditions, resulting in higher investment returns. Our term loan trading is integrated with our investment process on the trading desk that results in a higher utilization of your portfolio.

20.     In order to reassure clients and prospective clients of the safety of its program, Wells Fargo has stated that "[w]e have never had a negative earnings distribution in any month in a pool managed by our Program. Similarly, we have not had any instances requiring compensation to any client as a result of operational negligence on the part of Wells Fargo since our Program's inception."

21.     Wells Fargo also claimed to have a state-of-the-art system for ensuring that collateral is invested in accordance with limits articulated in securities lending agreements with its clients and regulatory limits that its clients must obey. Its marketing materials have stated as follows:

> Wells Fargo utilizes a homegrown front-end compliance system for all cash collateral investments. This system is used for all 16 cash collateral pools that Wells Fargo Securities Lending manages for its clients. Front-end compliance allows the portfolio manager to check investments against rule sets prior to executing a trade. Once a trade is executed in the system, the compliance officer further reviews the trade before the trade is automatically entered into the trust system. Rules in the front-end compliance system can be added or changed based on the investment guidelines of the client. Front-end compliance was developed in 2001 and since its inception Wells Fargo Securities Lending has not had an out-of-compliance situation.

22.     Wells Fargo repeatedly assured clients, prospective clients, and the general public that collateral from securities loans would be invested only in safe, liquid investments. For example, its marketing materials have stated as follows:

a. "Investment of cash collateral is made in high grade money market instruments."

b. "Primary considerations are given to principal preservation and liquidity, with current yield or potential total return is of secondary importance."

c. "Investments are made in accordance with individual clients' account guidelines."

d. "Our portfolio is 100% invested in fixed income and cash instruments with no exposure to equity or other specialty asset classes."

e.  "Every day funds are not doing it, they are throwing money away."

f.  The specific instruments in which Wells Fargo invested its securities lending clients' money were said to be chosen from an approved list created and maintained by its subsidiary, Wells Capital Management ("Wells Capital"), a registered investment adviser.

Wells Fargo made these types of assurances to Securian, Minnesota Life, Advantus, and the Series Fund on at least an annual basis.

23.   Wells Fargo assured the general public via its Internet site that its securities lending program was managed to mitigate risk. For example, at various points in time, Wells Fargo's Internet site has published claims including the following:

a.  Wells Fargo's securities lending program is "one of the most stable and successfully internally managed securities lending programs in the industry."

b.  Wells Fargo securities lending program "can maximize the earning potential of a client's portfolio while mitigating risks."

c.  Wells Fargo's securities lending program has "expertise in collateral management."

d.  Wells Fargo's securities lending program is managed to "ensure longevity, in line with our view to provide a prudent and conservatively executed securities lending solution."

e. Wells Fargo's "credit and risk management programs are closely reviewed by the Wells Fargo Compliance Department, and the Wells Fargo Internal Audit Group."

Some of these statements remain on Wells Fargo's Internet site as of the date of this Complaint.

24.     Wells Fargo also sent regular newsletters to its clients, including Minnesota Life and the Series Fund, repeating its claims that Wells Fargo invested securities lending collateral only in conservative investments that emphasized preservation of principal, liquidity, and high quality. For example, Wells Fargo sent a securities lending newsletter in August 2007, which reiterated that "[w]e have continued to take a conservative approach to investing in the money markets, an approach that has served our clients well. The discipline that we have instilled has continued to place a priority on preservation of principal, liquidity and high quality."

25.     On the basis of these and similar assurances, Minnesota Life and the Series Fund chose to participate in, and continue to participate in, Wells Fargo's securities lending program.  They trusted Wells Fargo to select specific investments of securities lending collateral within the guidelines and limitations set forth or referenced in the parties' securities lending agreements.

## The Securities Lending Agreements
### *The General Account Securities Lending Agreement ("General Account SLA")*

26.     With certain exceptions, Minnesota Life's obligations to policyholders and contract-holders are general obligations of Minnesota Life, which are backed by

securities and other assets Minnesota Life owns. These securities and other assets are referred to collectively as the "General Account."

27.    On February 17, 2000, Minnesota Life entered into an Indemnified Securities Lending Agreement with Wells Fargo, then known as Norwest Bank Minnesota, N.A. ("Norwest"), whereby Minnesota Life appointed Wells Fargo as agent for the lending of its General Account securities. The General Account SLA provides in part as follows:

**1.    _Appointment_**

[Minnesota Life] has appointed [Wells Fargo] under other agreements to serve as custodian of certain assets held by the [General Account]. Such agreements authorize [Minnesota Life] to appoint an agent to lend securities from the Accounts. [Minnesota Life] hereby appoints [Wells Fargo] as Agent for the purpose of lending securities from the [General Account] under the [Wells Fargo] Securities Lending Program.

**2.    _Agent's Activities_**

As agent for [Minnesota Life] and its Accounts, [Wells Fargo] undertakes the following:

a.    To enter into a Borrower Securities Loan Agreement with each Borrower setting forth the general terms governing loans made under the Securities Lending Program. . . .

c.    To negotiate loans directly or through a finder for a minimum of one day but with no fixed maximum term, retaining the power to terminate the loan at any time unless otherwise agreed with the Company.

d.    To require each loan when made to be collateralized in the amount of 102% of the market value of the loaned security and accrued interest.

e.      To mark each loaned security to market daily using the closing valuation as of the prior business day. Agent shall use a pricing service to obtain market valuation. If the market value of the given collateral falls to 100% of the loaned security market value, Agent shall request additional collateral to bring the collateralization back to 102%. Collateral in excess of 102% will be returned to the Borrower if requested.

f.      To receive and take possession of collateral in the form of U.S. Government Securities or cash. Cash received from all loans from Accounts will be commingled for investment purposes. Such cash shall be invested in repurchase agreements, master notes (VPN), U.S. treasuries and agencies, U.S. or Euro dollar certificates of deposit and time deposits, bankers acceptances, commercial paper and other short-term money market instruments, and mutual funds holding any of the previously mentioned securities and subject to policy and standard guidelines established from time to time by [Wells Fargo]. The prime considerations for the investment portfolio shall be safety of principal and liquidity requirements. Cash received will be invested per the Minnesota Life investment policy limitations as stated in Exhibit B, and as per the Collateral Guidelines for Securities Lending stated in Exhibit C, which ever is more restrictive. Additionally, no investment shall be made under this paragraph in any obligation, or other evidence of indebtedness of any business entity not organized under the laws of the United States or any state thereof, or the Dominion of Canada thereof, and no investment will be made in any business entity not rated in one of the four highest rating categories by at least one nationally recognized statistical rating organization. . . .

**4.      _Termination of Any Security Loan_**

A loan may be terminated by [Wells Fargo] or the Borrower at any time pursuant to the Borrower Securities Loan Agreement covering the loan. Unless otherwise agreed to, the Company may request [Wells Fargo] to terminate any loan of securities for any reason at any time. Upon such loan

termination, [Wells Fargo] will take delivery or receive through a Clearing Organization the securities to be returned. [Wells Fargo] will return to the Borrower directly or through the Clearing Organization the collateral securing the loan. Borrower Securities Loan Agreements provide for return of corporate securities not later than the third business day following loan termination notice and in the case of government securities not later than the next business day following loan termination notice. Notwithstanding the foregoing, Bank will have a reasonable time after receiving the Company's request to terminate any loan to liquidate cash collateral investments prior to terminating the loan, however the Borrower must return the loaned securities within five business days after termination notice by the Company.

**7.**     *Fees*

Income from the Securities Lending Program is generated by fees paid by the Borrowers and income from investment of cash collateral. All cash collateral is pooled and segregated for investment purposes. In acting as Agent for each Account, [Wells Fargo] will receive 30% on the net earnings from each loan and the particular Account will receive 70%. The fees will be calculated monthly and [Wells Fargo's] fee will be withheld from the remittance to the Account.

**8.**     *Risk of Loss*

 . . . [Wells Fargo] expressly assumes the risk of loss arising from negligent or fraudulent operation of its Securities Lending Program.

General Account SLA (Exhibit A).

### *The Separate Accounts Securities Lending Agreement ("Separate Accounts SLA")*

28.     Minnesota Life's obligations to certain groups of policyholders and contract-holders are backed by separate portfolios of assets, including securities. Each such portfolio is separately accounted for and segregated from the General Account assets of Minnesota Life by means of what are called "Separate Accounts," which hold

assets that exclusively back obligations to specified holders of Minnesota Life insurance policies and annuity contracts.

29.     On February 17, 2000, Minnesota Life entered into an Indemnified Securities Lending Agreement with Wells Fargo, then known as Norwest, whereby Minnesota Life appointed Wells Fargo as agent for the lending of securities in the Separate Accounts. The Separate Accounts SLA provides in part as follows:

**1.     _Appointment_**

[Minnesota Life] has appointed [Wells Fargo] under other agreements to serve as custodian of certain assets held by the Accounts. Such agreements authorize [Minnesota Life] to appoint an agent to lend securities from the Accounts. [Minnesota Life] hereby appoints [Wells Fargo], Minnesota as Agent for the purpose of lending securities from the Accounts under the [Wells Fargo] Securities Lending Program.

**2.     _Agent's Activities_**

As agent for [Minnesota Life] and its Accounts, [Wells Fargo] undertakes the following:

a.     To enter into a Borrower Securities Loan Agreement with each Borrower setting forth the general terms governing loans made under the Securities Lending Program. . . .

c.     To negotiate loans directly or through a finder for a minimum of one day but with no fixed maximum term, retaining the power to terminate the loan at any time unless otherwise agreed with the Company.

d.     To require each loan when made to be collateralized in the amount of 102% of the market value of the loaned security and accrued interest.

e.     To mark each loaned security to market daily using the closing valuation as of the prior business day. Agent

shall use a pricing service to obtain market valuation. If the market value of the given collateral falls to 100% of the loaned security market value, Agent shall request additional collateral to bring the collateralization back to 102%. Collateral in excess of 102% will be returned to the Borrower if requested.

f.      To receive and take possession of collateral in the form of U.S. Government Securities or cash. Cash received from all loans from Accounts will be commingled for investment purposes. Such cash shall be invested in repurchase agreements, master notes (VPN), U.S. treasuries and agencies, U.S or Euro dollar certificates of deposit and time deposits, bankers acceptances, commercial paper and other short-term money market instruments, and mutual funds holding any of the previously mentioned securities and subject to policy and standard guidelines established from time to time by [Wells Fargo]. The prime considerations for the investment portfolio shall be safety of principal and liquidity requirements. Cash received will be invested per the Minnesota Life separate account investment policy limitations as stated in Exhibit B, and as per the Collateral Guidelines for Securities Lending as stated in Exhibit C, which ever is more restrictive. Additionally, no investment shall be made under this paragraph in any obligation, or other evidence of indebtedness of any business entity not organized under the laws of the United States or any state thereof, or the Dominion of Canada thereof, and no investment will be made in any business entity not rated in one of the four highest rating categories by at least one nationally recognized statistical rating organization. . . .

**4.      _Termination of Any Security Loan_**

A loan may be terminated by [Wells Fargo] or the Borrower at any time pursuant to the Borrower Securities Loan Agreement covering the loan. Unless otherwise agreed to, the Company may request [Wells Fargo] to terminate any loan of securities for any reason at any time. Upon such loan termination, [Wells Fargo] will take delivery or receive

through a Clearing Organization the securities to be returned. [Wells Fargo] will return to the Borrower directly or through the Clearing Organization the collateral securing the loan. Borrower Securities Loan Agreements provide for return of corporate securities not later than the third business day following loan termination notice and in the case of government securities not later than the next business day following loan termination notice. Notwithstanding the foregoing, Bank will have a reasonable time after receiving the Company's request to terminate any loan to liquidate cash collateral investments prior to terminating the loan, however the Borrower must return the loaned securities within five business days after termination notice by the Company. . . .

**7.** _**Fees**_

Income from the Securities Lending Program is generated by fees paid by the Borrowers and income from investment of cash collateral. All cash collateral is pooled and segregated for investment purposes. In acting as Agent for each Account, [Wells Fargo] will receive 30% on the net earnings from each loan and the particular Account will receive 70%. The fees will be calculated monthly and [Wells Fargo's] fee will be withheld from the remittance to the Account.

**8.** _**Risk of Loss**_

 . . . [Wells Fargo] expressly assumes the risk of loss arising from negligent or fraudulent operation of its Securities Lending Program.

Separate Accounts SLA (Exhibit B).

### *The Series Fund Securities Lending Agreement ("Series Fund SLA")*

30.    The Series Fund has various investment Portfolios that operate as mutual funds and registered investment companies. The Series Fund Portfolios are available as investment options for holders of variable life insurance policies and variable annuity contracts offered by Securian or its affiliated companies. Beneficial ownership of all

securities in the Series Fund's Portfolios resides in the hands of these policyholders and contract-holders.

31.     On June 30, 2000, the Series Fund and its adviser, Advantus, entered into a Securities Lending Agreement with Wells Fargo, then known as Norwest, whereby the Series Fund appointed Wells Fargo as agent for the lending of securities held in some of the Series Fund's Portfolios. The Series Fund SLA provides as follows:

> ## 2.     *Delegation of Authority*
>
> Advantus Capital hereby delegates to the Custodian the administration of the Portfolios' securities lending activities, subject to the monitoring and supervision of Advantus Capital and/or the appropriate sub-advisers (the "Advisers"), and the Custodian hereby accepts such delegation. Pursuant to this delegation of authority:
>
> a.     The Custodian may only enter into loans on terms and conditions approved by the Advisers (the "Securities Loan Agreement"). The Securities Loan Agreement shall be substantially in the form attached hereto as Exhibit B. The Advisers shall have the right to approve in advance substantive changes to any Securities Loan Agreement. . . .
>
> c.     All collateral held by the Custodian in the form of securities, and all investments of cash collateral by the Custodian, must conform to, and be consistent with, both the Collateral Guidelines for Securities Lending attached hereto as Exhibit D, and the Fund's then current Prospectus and Statement of Additional Information, or in securities which otherwise may be specified by the Adviser in writing, as provided to the Custodian from time to time.
>
> ## 3.     *Custodian's Activities*
>
> For the compensation described below and in accordance with the Guidelines, and subject to the direction and

supervision of the Advisers, the Custodian undertakes the following:

a.      To enter into a Securities Loan Agreement with each Borrower setting forth the general terms governing loans made under the Program.

b.      To open an account (the "Account") for each Portfolio participating in the Program.

c.      To implement loans consistent with its delegated authority and with the Fund's then current Prospectus and Statement of Additional Information directly or through a finder, for a minimum of one day but within the term as set forth in the Guidelines, retaining the power to terminate the loan at any time unless otherwise agreed with the Fund.

d.      To require each loan when made to be collateralized in the amount of 102% of the market value of any domestic securities loaned or 105% of the market value of any international securities loaned, as the case may be, and accrued interest.

e.      To mark each loaned security to market daily using the closing valuation as of the prior business day. The Custodian shall use an independent pricing service to obtain market valuation. If the market value of the given collateral falls to 100% of the market value of the loaned security plus accrued interest, the Custodian shall request additional collateral from the Borrower to bring the collateralization back to 102% for any domestic securities loaned or 105% for any international securities loaned. Collateral in excess of 102% or 105%, as the case may be, will be returned to the Borrower if requested.

f.      To receive and take possession of collateral in the form of cash, government securities (as defined in the Investment Company Act of 1940 (the "Act")), irrevocable letters of credit issued by certain approved banks, or such other collateral as may be permitted by the Securities and Exchange Commission (the "Commission") or its staff. To the extent permitted

under the Act, and as interpreted by the staff of the Commission or pursuant to any exemptive order thereunder, cash received from all loans from one Portfolio's Account may be commingled for investment purposes with cash received from loans from Program accounts opened by another Portfolio or by other registered investment companies managed by Advantus Capital. Such cash may be invested only in the manner described in Section 2, paragraph c, above.

h.   To provide to the Fund Board of Directors each calendar quarter, a report in which the Custodian represents that all securities lending transactions effected during such quarter were in compliance with the terms and conditions set forth in the Guidelines.

**5.**   ***Termination of Any Security Loan***

A loan may be terminated by the Custodian or the Borrower at any time pursuant to the Securities Loan Agreement covering the loan. The Advisers may request the Custodian to terminate any loan of securities for any reason at any time. Upon such loan termination, the Custodian will take delivery or receive through a Clearing Organization the securities to be returned. The Custodian will return to the Borrower directly or through the Clearing Organization the collateral securing the loan. The Securities Loan Agreement will provide for the return of corporate securities no later than the third business day following loan termination notice and, in the case of government securities, no later than the next business day following loan termination notice, or for either, the standard settlement period. Notwithstanding the foregoing, the Custodian will have a reasonable time after receiving the Advisers' loan termination request to liquidate cash collateral investments prior to terminating the loan. . . .

**8.**   ***Fees***

Income from the Securities Lending Program is generated by fees paid by the Borrowers and income from investment of cash collateral, net of the Borrower rebate. To the extent permitted under the Act, and as interpreted by the staff of the Commission or pursuant to any exemptive order thereunder, cash received from all loans from one Portfolio's Account

may be commingled for investment purposes with cash received from loans from Program accounts opened by another Portfolio or by other registered investment companies managed by Advantus Capital. In acting as agent for the Portfolio, the Custodian will receive 30% on the net earnings from each loan and the Portfolio will receive 70%. The income generated by the Program will be calculated and credited monthly to both the Custodian and the Portfolio or the Account.

### 9.   *Risk of Loss*

 . . . The Custodian expressly assumes the risk of loss arising from negligent or fraudulent operation of the Program except those losses resulting from negligent or fraudulent operations of the Fund or Advantus Capital.

Series Fund SLA (Exhibit C).

32.    In or about July 2000, Wells Fargo recommended that the Series Fund obtain an "exemptive order" from the SEC, which would permit Wells Fargo to aggregate the securities lending collateral for all of the Series Fund Portfolios into a single "Joint Account" for the purpose of investment. Wells Fargo indicated that this would enable it to invest the Series Fund's securities lending collateral more efficiently.

33.    The Series Fund applied to the SEC for an exemptive order, and the SEC issued such an order on March 28, 2001 ("the Exemptive Order"). Among other things, the Exemptive Order provides as follows:

Funds participating in a Joint Account will invest through the Joint Account only to the extent that, regardless of the Joint Account, they would desire to invest in short-term liquid investments that are consistent with their respective investment objectives, policies and restrictions. A Fund's decision to use a Joint Account will be based on the same factors as its decision to make any other short-term liquid investment. The sole purpose of the Joint Accounts would be

> to provide a convenient means of aggregating what otherwise
> would be one or more daily transactions for some or all Funds
> necessary to manage their respective Cash Balances.

Thereafter, pursuant to the Exemptive Order, Wells Fargo aggregated all of the securities lending collateral held by any of the Series Fund's participating Portfolios into a single Joint Account. Under the Exemptive Order, each participating Portfolio of the Series Fund would then own a pro-rata share of any investment held in the Joint Account. To the extent the Portfolios were governed by varying investment restrictions, Wells Fargo could abide by all of the applicable restrictions only if it complied with the most-restrictive investment limitations governing any participating Portfolio. Put another way, if the Series Fund's governing documents did not expressly permit *every* participating Series Fund Portfolio to invest in a given security, Wells Fargo had to ensure that no investment in such security was ever made within the Joint Account.

34.     Among the Series Fund Portfolios that participated in securities lending were the Index 400 Mid-Cap Portfolio and the Index 500 Portfolio (collectively, "the Index Portfolios"). The Prospectus and SAI allowed the Index Portfolios to invest a portion of their assets in "commercial paper and other money market securities," but limited such investments to certain obligations of U.S. and Canadian banks; obligations of the International Bank for Reconstruction and Development; and highly-rated "[c]ommercial paper . . . issued by U.S. corporations or affiliated foreign corporations." The Index Portfolios were not permitted to invest in asset-backed securities or mortgage-backed securities.

**The Wells Fargo Trust for Securities Lending**

35.     After Minnesota Life began participating in the securities lending program, Fargo established a trust for securities lending ("the Trust"). The Trust's foundational documents named Wells Fargo as trustee. The purpose of the Trust was "the investment and reinvestment of money and other property contributed thereto by participants in the securities lending program administered by the Trustee or its affiliates." At some point, Wells Fargo transferred securities lending collateral from the General Account and the Separate Accounts into the Trust, and Minnesota Life became a shareholder in and beneficiary of the Trust.

36.     According to the foundational Trust documents, "[t]he business and affairs of the Trust shall be managed by or under the direction of [Wells Fargo], and it shall have all powers necessary or desirable, convenient or incidental, to carry out that responsibility." Wells Fargo was given extensive authority to manage and control the Trust:

> [Wells Fargo] shall have full, exclusive and complete power and discretion to manage and control the business and affairs of the Trust, and to make all decisions affecting the business and affairs of the Trust. . . . [Wells Fargo] shall have exclusive and absolute control over the Trust Property and business in its own right. . . . To the fullest extent permitted by applicable law, [Wells Fargo] shall not in any way be bound by current or future laws or customs applicable to trust investments, but shall have full power and authority to make any investments which it, in its sole discretion, deems proper to accomplish the purposes of the Trust, consistent with the investment objectives established by [Wells Fargo] for the Trust and/or the separate Series of the Trust. . . . Without limiting the foregoing, [Wells Fargo's] power and authority shall include . . . the power and the authority . . . [t]o

> subscribe for, invest in, reinvest in, purchase, or otherwise acquire, hold, pledge, sell, assign, transfer, exchange, distribute, or otherwise deal in or dispose of any form of property, including, without limitation, cash (U.S. currency, foreign currencies and related instruments), and those securities described more completely in the guidelines applicable to each Series. . . .

37.     According to the foundational Trust documents, any shareholder has the right to redeem its shares on any given business day:

> Each Shareholder of a Series shall have the right at such times as may be determined by the Trustee, but no less frequently than as of the close of business on each Business day, to require the Series to redeem all or any part of his or her Shares at a redemption price per Share equal to their Net Asset Value next determined by after receipt by [Wells Fargo] of a request for redemption. . . . [Wells Fargo] may, at its sole discretion, suspend a Shareholder's right of redemption for a period not exceeding seven days when necessary in the judgment of the Trustee to protect the best interests of the Trust and the Shareholders.

38.     The foundational Trust documents also required Wells Fargo to determine the Net Asset Value ("NAV"), meaning the actual dollar value of each share in the securities lending program, "in a manner consistent with the 1940 Act." Wells Fargo was required to determine the NAV for each series within the securities lending program "at such times as may be prescribed by [Wells Fargo] or, in the absence of action by [Wells Fargo], as of the close of regular trading on the New York Stock Exchange on each day such Exchange is open for trading."

39.     Under the foundational Trust documents, Wells Fargo is "liable for any loss, damage or claim incurred by reason of [Wells Fargo's] bad faith, gross negligence,

willful misconduct or reckless disregard of the duties involved in the conduct of his or her office."

**Wells Fargo owed Minnesota Life and the Series Fund fiduciary duties.**

40.     Minnesota Life and the Series Fund justifiably entrusted Wells Fargo with the operation of the securities lending program, including the selection of investments within the limitations set by the securities lending agreements, investment guidelines, the Exemptive Order, the Series Fund's current Prospectus and SAI, and any other applicable laws or restrictions. Wells Fargo accepted this entrustment, and it was in a position of superior knowledge with respect to securities lending in general and the particular securities in which it invested on behalf of Minnesota Life and the Series Fund. As a result, Wells Fargo owed Minnesota Life and the Series Fund a fiduciary duty with respect to the operation of the securities lending program, the selection of investments on behalf of Minnesota Life and the Series Fund, and the decision whether to hold such investments.

41.     Minnesota Life and the Series Fund appointed Wells Fargo as their agent for securities lending. Wells Fargo accepted that appointment. As an agent, Wells Fargo owed Minnesota Life and the Series Fund a fiduciary duty with respect to the operation of the securities lending program, the selection of investments on behalf of Minnesota Life and the Series Fund, and the decision whether to hold such investments.

42.     Wells Fargo was the trustee of the Trust of which Minnesota Life was a beneficiary. As trustee, Wells Fargo owed Minnesota Life a fiduciary duty with respect to the management of the Trust, the operation of the securities lending program, the

selection of investments on behalf of Minnesota Life, and the decision whether to hold such investments.

43.     As a fiduciary, Wells Fargo owed Minnesota Life and the Series Fund the highest obligation of good faith, loyalty, fidelity, fair dealing, and full disclosure of material matters affecting their interests. Wells Fargo had an obligation to invest Minnesota Life's and the Series Fund's securities lending collateral in accordance with the prime considerations of "safety of principal and liquidity;" to act prudently and to exercise due diligence in the investigation of potential investments; to exercise informed judgment with respect to those investments; to take reasonable actions to protect its clients from investment losses in the event that a seemingly prudent investment becomes an imprudent investment; to disclose material matters affecting Minnesota Life's and the Series Fund's investments; to treat all of its clients equally and not favor any one client over any other; and to put Minnesota Life's and the Series Fund's interests ahead of its own desire to profit.

**Until 2007, the securities lending program appeared to operate as advertised.**

44.     From 2000 through mid-2007, Wells Fargo's securities lending program appeared to operate as advertised. During that period Minnesota Life and the Series Fund had as much as $2 billion worth of securities on loan through the Wells Fargo program.

45.     From 2000 to mid-2007, Wells Fargo regularly reported to Minnesota Life and the Series Fund that "[a]ll securities lending activities were conducted pursuant to the respective investment objectives, principal investment strategies and investment policies of each Fund," or other words to that effect.

46.     From 2000 to mid-2007, Minnesota Life and the Series Fund earned returns from the securities lending program that were consistent with the low-level of risk associated with the money market type investments in which securities lending collateral was to be invested.

47.     From 2000 to mid-2007, Wells Fargo earned more than $5 million in fees for its services as a securities lending agent to Minnesota Life and the Series Fund.

**In 2006 and 2007, Wells Fargo began investing securities lending collateral in inappropriate, illiquid investments, including structured investment vehicles.**

48.     At some point before 2007, Wells Fargo changed how it was operating the securities lending program. In order to maximize its own profits, Wells Fargo began investing securities lending collateral in higher-yield and riskier investments. If those investments paid off, Wells Fargo would profit. If the investments lost money, however, Wells Fargo had no intention of indemnifying clients for those losses. In the pursuit of profit, Wells Fargo began ignoring its duties to its clients and taking increased risks with its clients' money.

49.     Wells Fargo did not inform Minnesota Life or the Series Fund that it was changing its approach to collateral investment. To the contrary, Wells Fargo continued to make the same assurances it always had—often verbatim—including the assurance that it would never sacrifice "principal preservation and liquidity" in the pursuit of greater "current yield or potential total return."

50.     In keeping with its new strategy, at some point in 2006, Wells Fargo began investing Minnesota Life's and the Series Fund's collateral in foreign "structured

investment vehicles" ("SIVs"). An SIV is an entity that attempts to profit by selling short-term notes to investors at low interest rates and investing the proceeds in longer-term debt obligations (such as consumer loans and mortgage loans) at relatively higher interest rates. Because an SIV's short-term debts almost always come due before its long-term investments mature, an SIV can only continue to function for as long as it is able to roll over or reissue its short-term notes in exchange for new investments. If the pace of investment in a given SIV slows, or if the debt obligations within the SIV begin to default, the SIV will be unable to make its short-term debt payments to investors, and it will default and collapse.

51.     SIVs are not typically organized under the laws of the United States or any state thereof or under the laws of Canada or any province thereof. Instead, they are typically organized under the laws of foreign countries such as the Cayman Islands, Bermuda, or Ireland. As a result, SIVs typically do not file reports with the SEC or other U.S. regulators; it is difficult for investors in an SIV to obtain information about the SIV's assets; and it is difficult for an investor to predict how an SIV's assets will be priced and distributed in the event the SIV fails.

52.     Since SIVs are typically foreign entities, they are unable to sell notes directly to investors in the United States. In order to sell their foreign notes to U.S. investors, foreign SIVs organize or affiliate with an empty-shell company in the United States, which co-issues the SIV's notes or issues its own notes backed only by the SIV's foreign notes.

53.     Wells Fargo has publicly criticized SIVs. For example, Wells Fargo's annual report from 2007 states as follows:

> Unlike many of our competitors, we did not participate to any significant degree in collateralized debt obligations (CDOs), structured investment vehicles (SIVs) to hold assets off our balance sheet, hedge fund financing, off-balance sheet conduits, the underwriting of low-covenant or no-covenant, large, highly leveraged loans and commitments to companies acquired by private equity firms through leverage buyouts (LBOs).

In a 2008 interview, Wells Fargo CEO John Stumpf described his view of SIVs as follows:

> In fact, I was embarrassed at the time, but not so much now, that I didn't even know what an SIV was. I thought it was some new automobile. When I finally figured it out, I thought, "Why would people do this?" What advantage, what purpose does an SIV serve, other than putting something off balance sheet and keeping it from your investors and taking enormous risks?

**Wells Fargo invested in a foreign SIV called Cheyne Finance,
which failed in 2007.**

54.     Cheyne Finance Plc. ("Cheyne Finance") was an SIV organized under the laws of Ireland and managed by a London-based hedge fund manager called Cheyne Capital Management, Ltd. Like other SIVs, Cheyne Finance issued short and medium-term notes to finance investments in longer-term debt obligations, primarily mortgage-backed securities. Cheyne Finance issued notes to investors in the United States through its wholly-owned subsidiary, Cheyne Finance, LLC, a Delaware limited liability company that had no assets, no employees, and no operations in the United States or else-where.

55.     Wells Capital added Cheyne Finance notes to the approved list of investments for the securities lending program sometime in 2006. Shortly thereafter, Wells Fargo began investing securities lending collateral in notes issued by Cheyne Finance.

56.     Wells Fargo failed to ensure that the Cheyne Finance notes fulfilled and continued to fulfill the prime considerations for the securities lending investment portfolio—namely safety of principal and liquidity. Among other things, Wells Fargo failed to obtain detailed information about Cheyne Finance's underlying assets.

57.     Wells Fargo invested securities lending collateral from the General Account and the Separate Accounts in Cheyne Finance notes in contravention of express provisions in the General Account SLA and the Separate Accounts SLA requiring that "no investment shall be made under this paragraph in any obligation, or other evidence of indebtedness of any business entity not organized under the laws of the United States or any state thereof, or the Dominion of Canada thereof."

58.     Wells Fargo invested securities lending collateral from the Series Fund in Cheyne Finance notes in contravention of provisions in the Series Fund's then-current Prospectus and SAI that prohibited investments in asset-backed securities and mortgage-backed securities, and that limited money market and commercial paper investments to investments in certain obligations of U.S. and Canadian banks; obligations of the International Bank for Reconstruction and Development; and highly-rated "[c]ommercial paper . . . issued by U.S. corporations or affiliated foreign corporations."

59.    Wells Fargo did not disclose to Minnesota Life or the Series Fund the fact that it had invested securities lending collateral from the General Account, Separate Accounts, and the Series Fund in notes issued by an Ireland-based SIV.

60.    Wells Fargo learned by mid-2007 that Cheyne Finance was at risk of default and was not an appropriate investment for a money market type fund:

    a.    By June 2007, one of Cheyne Finance's funds had reported significant losses due to rising delinquencies in the mortgage market. In response, Wells Capital placed Cheyne Finance notes on a 32-day maturity restriction.

    b.    By July 2007, on the advice of Wells Capital, Wells Fargo's money market funds had eliminated all investments in Cheyne Finance. Wells Fargo's securities lending group ignored Wells Capital's warnings, failed to eliminate Cheyne Finance notes from securities lending program, and even caused its securities lending program to purchase additional Cheyne Finance notes after Wells Capital had issued its warnings about Cheyne Finance.

    c.    On August 28, 2007, Standard & Poor's ("S&P") downgraded Cheyne Finance's short-term notes by six notches, noting that Cheyne Finance had failed to meet tests measuring the value of its investment portfolio against its debt obligations and "may begin an orderly liquidation of assets."

    d.    Throughout this chain of events, Wells Fargo continued to maintain a published NAV of $10 per share of the securities lending collateral pools.

In reality, the market value for Cheyne Finance notes was in decline, as was the actual NAV of shares in the securities lending collateral pools.

61.     On August 31, 2007, Wells Fargo met with representatives of Minnesota Life and the Series Fund for their annual review of the securities lending program. Wells Fargo's written presentation materials made no mention of the S&P downgrade or the imminent collapse of Cheyne Finance.

62.     On September 17, 2007, Wells Fargo sent a securities lending newsletter to representatives of Minnesota Life and the Series Fund. The newsletter stated that the securities lending program had earnings in August that were "a significant amount higher than last month's earnings or the monthly earnings rate that you expect from the program." It stated that these high earnings were the result of "High Equity Balances," "High Treasury and Agency Balances," and "Unusually High Spreads." It did not state that the higher earnings were the result of investments in unusually risky assets. To the contrary, the newsletter stressed that Wells Fargo was taking steps to "mitigate risks in the securities lending program in this time of market volatility:"

> Wells Fargo has written guidelines for each of its collateral investment portfolios. We have reviewed the guidelines for each portfolio and, in all cases, are investing in a considerably more conservative fashion than the investment guidelines would allow. These guidelines are monitored through automated systems and manual checks each day.
>
> We have been carefully watching the issues in fixed income markets related to sub-prime mortgage exposure and liquidity needs for more than six months. In order to conservatively position our portfolios, we have been reducing the weighted average maturity (WAM); it is now at 8-12 days across the

program, down from the typical 15-19 day range, and 12-14 days in mid-August.

We have increased our overnight positions program-wide to 33-40% range rather than the more typical 20-30% range. Overnight rates are still very competitive.

We work closely with the team of fixed income analysts at Wells Capital Management in reviewing each issuer and issue purchased for our portfolios. We continue to be very conservative in approving names for purchase based on the financial and management analytics. We are confident that we have purchased highly-rated high-quality fixed income instruments for the collateral portfolios and are working through any issues that the market-wide liquidity squeeze has produced.

The September 17, 2007 newsletter made no mention of the S&P downgrade or the imminent collapse of Cheyne Finance.

63.     Wells Fargo did not notify Minnesota Life or the Series Fund of any concerns about the securities lending program or Cheyne Finance until mid-October 2007. On the morning of October 12, 2007, the Managing Director of Wells Fargo's securities lending program, Bob Smith, contacted Gary Kleist (an officer of Minnesota Life and the Series Fund) by telephone. Smith stated that Wells Fargo's securities lending program had invested securities lending collateral in Cheyne Finance notes and that several ratings agencies had recently downgraded Cheyne Finance's debt. He stated that Wells Fargo believed the most prudent course of action was to hold the Cheyne Finance investment. He did not disclose that Wells Capital advised Wells Fargo to eliminate Cheyne Finance from its conservatively managed portfolios many months earlier.

64.     Later on October 12, 2007, Smith emailed Mr. Kleist and reiterated these points:

> Gary, here is the information we talked about this morning for the Cheyne Investment regarding the holdings. This is the holding that has been downgraded by the rating agencies and is in the process of being restructured. We should know more details in the next couple of weeks. S&P is still investment grade, Moody's downgraded it further last week). [sic] In regards to the current Cheyne investments, we continue to believe that holding the issue is the appropriate action given information currently available to us. Cheyne has not missed a scheduled debt payment so far. Debt service appears to be supported by a portfolio of highly rated assets, in the view of the rating agencies. The August pool report for the investment indicated the portfolio is composed of 70.8% AAA, 26.1% AA, and 2.5% A rated investments. Liquid assets, primarily investments converted to cash, totaled over $1B.

65.     Despite the problems with Cheyne Finance, Wells Fargo continued to describe the securities lending program in positive terms. For example, on October 15, 2007—three days after Wells Fargo notified Minnesota Life and the Series Fund that there might be a problem with Cheyne Finance—Smith sent the following communication to all of Wells Fargo's securities lending clients:

> This has been another interesting and dynamic month in the fixed income markets. For the second month in a row, our clients have benefited with increased earnings from wider spreads and favorable pricing in the commercial paper markets. These abnormal conditions are difficult to predict due to the day to day volatility and the uncertainty in the credit markets. We know there will be change, we just don't know when or of what magnitude.
>
> Now that we are two months into a period of unusual trading and lack of liquidity in the short-term fixed income markets, we are seeing more normal pricing and a return to some of the

standard trading patterns. Prices on commercial paper and overnight repurchase agreements are trading more consistently with the credit ratings of the issuers and with the maturity of the instruments than we saw in August. Issuers are successfully returning to the markets with floating rate and commercial paper issues out to 90 days or more. At September 30, there was still significantly more fixed rate paper being issued than floating rate paper, indicating that buyers are back in the market but that there is still a fair amount of uncertainty about strength of the economy.

We continue to take a very conservative position in collateral portfolio management with a focus on safety of principal, liquidity and yield for our clients. We are still maintaining high liquidity (overnight) balances and have up to 60% of our portfolios maturing in 60 days in most cases. We are letting issues with longer maturities roll off at maturity date and are reinvesting in short fixed rate commercial paper (1-30 days). Our overall average credit quality in the portfolio is AA (long term) or Al-PI (short term).

We continue to invest in the business with the recent deployment of an automated recall management system to be used for more efficient recalls of securities from the borrowers. We are also testing two data systems that supply market intelligence to price securities on loan. This will be especially important for securities that begin trading special. We hope to select and fully install one of these systems before year end.

We value your business and the relationships with Wells Fargo. Please call us with your questions.

Smith's October 15, 2007 letter made no reference to the problems at Cheyne Finance.

66.     On October 17, 2007, a court in the United Kingdom declared an "insolvency event" that allowed Cheyne Finance to stop paying its short-term debts. In response, S&P downgraded Cheyne Finance's notes to default status.

67.     After Minnesota Life and the Series Fund learned of the problems with Cheyne Finance, they sought to learn as much as they could about Cheyne Finance and

about the process by which Wells Fargo had chosen to invest their money in Cheyne Finance. On or about October 23, 2007, representatives of Minnesota Life and the Series Fund met with representatives of Wells Fargo at Wells Fargo's office in Minneapolis. What they learned shocked them:

    a.   Wells Fargo had received no detailed information or reports from Cheyne Finance's managers.

    b.   Although Smith had represented on October 12, 2007 that Cheyne Finance's "[d]ebt service appears to be supported by a portfolio of highly rated assets," Wells Fargo in fact had no detailed information about the underlying debt obligations in which Cheyne Finance had invested.

    c.   Although Wells Fargo had long claimed to have "[p]rocedures in place to use if necessary to liquidate collateral and credit client accounts," Wells Fargo in fact had no contingency plan for how it would deal with a drop in market values.

    d.   Despite the problems with Cheyne Finance, Wells Fargo was continuing to invest securities lending collateral in SIVs.

68.    On November 20, 2007, Smith sent a letter to Wells Fargo's securities lending clients acknowledging the downgrade of Cheyne Finance. Even then, more than four months after Wells Capital had internally recommended that Wells Fargo divest its conservative portfolios of Cheyne Finance, Smith claimed that Wells Fargo saw "no advantage in pre-maturity sales. . . . It is our belief that fixed income markets will return to normal over time, and, with the small exposure we have overall to asset-backed

securities, we also believe our investment portfolios will be less impacted in the future by pricing pressures in the asset-backed markets."

69.     In the November 20, 2007 letter, Smith also indicated that Wells Fargo had—without informing its clients—instituted a "floating NAV" on November 7, 2007. As a result, whereas the published NAV for the securities lending program had always been stable at $10 per share, after November 7, 2007, shares of the securities lending pool were being revalued on a daily "marked-to-market" basis to account for the diminution in value of Cheyne Finance and other investments. As a result, clients who withdrew securities from the securities lending program would no longer receive the full value of the securities they had loaned.

70.     On information and belief, Wells Fargo permitted at least one client to exit the securities lending program after Wells Fargo learned of problems with Cheyne Finance but before Wells Fargo had notified Minnesota Life or the Series Fund of problems with Cheyne Finance. That client was able to withdraw before Wells Fargo notified clients that it had instituted the "floating NAV," and it was therefore able to obtain full value of the loaned securities and to realize none of the securities lending program's losses on Cheyne Finance. The losses that that client would have realized on Cheyne Finance were instead concentrated among the clients that Wells Fargo forced to remain in the collateral pools, including Minnesota Life. That client was therefore given preferential treatment in comparison to the treatment Wells Fargo accorded to Minnesota Life and other clients who were forced to remain in the collateral pools.

71.     After Wells Fargo informed them of the problems with Cheyne Finance, Minnesota Life and the Series Fund sought to exercise their contractual right to withdraw from Wells Fargo's securities lending program. Wells Fargo refused. As a result, Minnesota Life and the Series Fund were forced to continue participating in the securities lending program. If they had been permitted to withdraw, Minnesota Life and the Series Fund could have eliminated or reduced ongoing risk caused by Wells Fargo's imprudent investments.

72.     In tacit recognition of its error in electing to invest client funds in Cheyne Finance, Wells Fargo's November 20, 2007 letter indicated that Wells Fargo would forego its split of profits from securities lending for the time being:

> We understand these are difficult markets for all of us. Given the uncertainty surrounding your investment in Cheyne, Wells Fargo has decided to provide our share of the revenue split to you while this issue is being resolved. Effective October 17, we will waive the Wells Fargo portion of the fee split for any portion of a client's lending program invested in the business trusts holding Cheyne. Revised earnings statements will be sent soon.

73.     Minnesota Life and the Series Fund suffered significant unreimbursed losses as a result of the Cheyne Finance investment. The General Account suffered approximately $7 million in losses on Cheyne Finance. The Separate Accounts suffered approximately $600,000 in losses on Cheyne Finance. The Series Fund suffered approximately $3 million in losses on Cheyne Finance.

74.     If Wells Fargo had caused its securities lending program to sell its Cheyne Finance notes at an earlier date, Minnesota Life's and the Series Fund's losses would

have been avoided. Indeed, Wells Fargo's money market funds suffered little or no loss on Cheyne Finance because they heeded Wells Capital's advice to sell Cheyne Finance securities by July 2007.

75.     Wells Fargo reimbursed its proprietary money market funds for whatever losses they suffered on Cheyne Finance. Minnesota Life and the Series Fund demanded that Wells Fargo likewise indemnify them for losses they had suffered as a result of the Cheyne Finance investment. Wells Fargo refused.

**Wells Fargo invested in a foreign SIV called Victoria Finance, which failed in early 2008.**

76.     Stanfield Victoria Finance Ltd. a/k/a Victoria Finance Ltd. ("Victoria Finance") was an SIV organized under the laws of the Cayman Islands. Like other SIVs, Victoria Finance issued short and medium-term notes to finance investments in longer-term debt obligations, primarily mortgages and consumer loans. Victoria Finance issued notes to investors in the United States through its wholly-owned subsidiary, Stanfield Victoria Funding, LLC a/k/a Victoria Funding, LLC ("Victoria USA"), a Delaware limited liability company that had no assets, no employees, and no operations in the United States or elsewhere. Victoria Finance's Private Placement Memorandum describes Victoria USA as follows:

> Victoria USA will not receive any portion of the proceeds realized from any offering of Senior Debt Securities, will not purchase or hold any Investments (and otherwise will not have significant assets other than its rights under certain Program Documents) and will not engage in any independent business activities. Victoria USA has agreed to co-issue the Senior Debt Securities solely as an accommodation to the Company and is not to receive any remuneration for so

> acting. The Company, in turn, has undertaken to Victoria USA to pay all expenses which Victoria USA may incur in connection with the Senior Debt Securities programs . . .

77.     Wells Capital added Victoria Finance's notes to the approved list of investments for the securities lending program sometime in 2006. Shortly thereafter, Wells Fargo began investing securities lending collateral in Victoria Finance notes.

78.     Wells Fargo failed to ensure that Victoria Finance fulfilled and continued to fulfill the prime considerations for securities lending collateral investments, namely safety of principal and liquidity. Among other things, Wells Fargo failed to obtain or appropriately analyze detailed information about Victoria Finance's underlying assets.

79.     Wells Fargo invested securities lending collateral from the General Account and the Separate Accounts in Victoria Finance in contravention of express provisions in the General Account SLA and the Separate Accounts SLA requiring that "no investment shall be made under this paragraph in any obligation, or other evidence of indebtedness of any business entity not organized under the laws of the United States or any state thereof, or the Dominion of Canada thereof."

80.     Wells Fargo invested securities lending collateral from the Series Fund in Victoria Finance notes in contravention of provisions in the Series Fund's then-current Prospectus and SAI that prohibited investments in asset-backed securities and mortgage-backed securities, and that limited money market and commercial paper investments to investments in certain obligations of U.S. and Canadian banks; obligations of the International Bank for Reconstruction and Development; and highly-rated "[c]ommercial paper . . . issued by U.S. corporations or affiliated foreign corporations."

81.     Wells Fargo did not disclose to Minnesota Life or the Series Fund the fact that it had invested securities lending collateral from the Series Fund in notes issued by a Cayman Islands-based SIV.

82.     Wells Fargo learned by mid-2007 that Victoria Finance was at risk of default and was not an appropriate investment for a money market type fund:

     a. On the advice of Wells Capital, Wells Fargo caused its proprietary money market funds to sell off Victoria Finance notes from June to October 2007 at minimal losses.

     b. By August 2007, Wells Capital identified Victoria Finance as an issuer from which no further purchases should be made. Wells Fargo's securities lending group ignored Wells Capital's warnings, failed to eliminate Victoria Finance notes from securities lending program, and even caused its securities lending program to purchase additional Victoria Finance notes after Wells Capital had issued its warnings about Victoria Finance.

83.     On December 21, 2007, Moody's downgraded Victoria Finance to Baa3. Moody's stated in a news release that the downgrade reflected "the steep decline in the market value of the vehicle's asset portfolio from 98 percent (in September) to 95.5 percent."

84.     On January 7, 2008, S&P lowered Victoria Finance's credit rating 13 levels to B-. Describing the S&P downgrade, Bloomberg reported that "[t]he Cayman Islands-based fund, which is due to pay $275 million this week, won waivers from lenders in December after its debt was downgraded, violating credit agreements. The waiver was

due to expire yesterday, said S&P, without indicating whether a fresh agreement is possible."

85.     In January 2008, Wells Fargo notified Minnesota Life and the Series Fund that there had been an enforcement action regarding Victoria. An Enforcement Manager had been appointed to determine whether Victoria's assets were sufficient to support its outstanding liabilities. On January 17, 2008, the Victoria Enforcement Manager conducted a market pricing exercise, the results of which were reported to Minnesota Life and the Series Fund on January 21, 2008. Only 60.8% of Victoria's assets received bids, and the market value of those assets was just 72.6% of par. As a result, the value of Victoria Finance's notes declined precipitously.

86.     Minnesota Life and the Series Fund suffered significant unreimbursed losses as a result of the Victoria Finance investment. The General Account suffered nearly $6 million in losses on Victoria Finance. The Separate Accounts suffered more than $200,000 in losses on Victoria Finance. The Series Fund suffered approximately $1.7 million in losses on Victoria Finance.

87.     If Wells Fargo had caused its securities lending program to sell Victoria Finance at an earlier date, Minnesota Life's and the Series Fund's losses would have been avoided. Indeed, Wells Fargo's money market funds suffered little or no losses on Victoria Finance because they heeded Wells Capital's advice to sell Victoria Finance securities between June and October 2007.

88.     Wells Fargo reimbursed its proprietary money market funds for whatever losses they suffered on Victoria Finance. Minnesota Life and the Series Fund demanded

that Wells Fargo likewise indemnify them for losses they had suffered as a result of the Victoria Finance investment. Wells Fargo refused.

**Wells Fargo invested in corporate bonds issued by Lehman Brothers, and Lehman Brothers failed in 2008.**

89.     Lehman Brothers Holdings Inc. ("Lehman") was a financial services firm and investment bank. Among other things, Lehman issued corporate bonds.

90.     Wells Capital added Lehman corporate bonds to the approved list of investments for the securities lending program at some point in time before 2008. Shortly thereafter, Wells Fargo began investing securities lending collateral in Lehman corporate bonds. By 2008, Wells Fargo had a significant percentage of the securities lending program's holdings invested in Lehman corporate bonds, all of which had maturity dates three years after issuance. Wells Fargo's decision to make a significant investment in relatively illiquid, relatively long-term bonds from a single issuer was imprudent and reckless.

91.     Although it did not disclose this fact to Minnesota Life, Wells Fargo learned by the spring of 2008 that Lehman was at risk of default and was not an appropriate investment for a money market-type fund. In April 2008, Wells Capital placed restrictions on the holding of Lehman corporate bonds, and it recommended internally that portfolio managers eliminate Lehman bonds from proprietary money market portfolios. As a result, Wells Fargo had eliminated Lehman securities from its proprietary money market portfolios by June 2008. Wells Fargo had consistently claimed that Wells Capital provided investment research and the approved list of securities to the

securities lending program, but Wells Fargo's securities lending portfolio ignored Wells Capital's recommendation that money market portfolios divest of Lehman corporate bonds. Wells Fargo's securities lending program continued to hold substantial positions in Lehman corporate bonds until at least September 2008.

92.     On September 15, 2008, Lehman filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. As a result, the value of Lehman's corporate bonds declined precipitously.

93.     Minnesota Life suffered significant unreimbursed losses as a result of the Lehman investment. The General Account suffered nearly $18 million in losses on the Lehman investment.

94.     If Wells Fargo had caused its securities lending program to sell Lehman corporate bonds at an earlier date, Minnesota Life's losses would have been avoided. Indeed, Wells Fargo's money market funds suffered little or no losses on Lehman corporate bonds because they heeded Wells Capital's advice to sell Lehman securities months before its bankruptcy.

95.     Wells Fargo reimbursed its proprietary money market funds for whatever losses they suffered on Lehman. Minnesota Life demanded that Wells Fargo likewise indemnify them for losses they had suffered as a result of the Lehman investment. Wells Fargo refused.

**Assignment of Claims**

96.     On January 22, 2008, Securian guaranteed payment of principal and interest on the Cheyne Finance and Victoria Finance securities in the Separate Accounts. On

February 29, 2008, in order to protect Minnesota Life's policyholders and contract holders, Securian purchased the Cheyne Finance and Victoria Finance notes from the Separate Accounts for the full principal outstanding on the notes as of that date plus accrued interest. Securian thereby reimbursed policyholders and contract-holders whose policies were backed by Separate Accounts assets for all losses they suffered as a result of Wells Fargo's investments in Cheyne Finance and Victoria Finance In exchange, Minnesota Life assigned its claims against Wells Fargo relating to the Separate Accounts to Securian.

97.     On January 22, 2008, Securian guaranteed payment of principal and interest on the Cheyne Finance and Victoria Finance notes in the Series Fund Joint Account. On February 29, 2008, in order to protect policyholders and contract holders who had chosen to participate in Series Fund Portfolios, Securian purchased the Cheyne Finance and Victoria Finance securities from the Separate Accounts for the full principal outstanding on the securities as of that date plus accrued interest. Securian thereby reimbursed investors in the Series Fund for all losses they suffered as a result of Wells Fargo's investments in Cheyne Finance and Victoria Finance. In exchange, the Series Fund assigned its claims against Wells Fargo to Securian.

## COUNT I

### Breach of Contract – General Account SLA

98.     Securian and Minnesota Life reallege the foregoing paragraphs.

99.     The General Account SLA is a valid contract.

100.    The General Account SLA imposed various contractual duties upon Wells Fargo, including an implied covenant of good faith and fair dealing.

101.    Wells Fargo breached the General Account SLA and thereby caused damages to Minnesota Life in the form of losses to the General Account.

## COUNT II

### Breach of Contract – Separate Accounts SLA

102.    Securian and Minnesota Life reallege the foregoing paragraphs.

103.    The Separate Accounts SLA is a valid contract.

104.    The Separate Accounts SLA imposed various contractual duties upon Wells Fargo, including an implied covenant of good faith and fair dealing.

105.    Wells Fargo breached the Separate Accounts SLA and thereby caused damages to Minnesota Life in the form of losses to the Separate Accounts.

## COUNT III

### Breach of Contract – Series Fund SLA

106.    Securian and Minnesota Life reallege the foregoing paragraphs.

107.    The Series Fund SLA is a valid contract.

108.    The Series Fund SLA imposed various contractual duties upon Wells Fargo, including an implied covenant of good faith and fair dealing.

109.    Wells Fargo breached the Series Fund SLA and thereby caused damages to the Series Fund in the form of losses to the Series Fund.

## COUNT IV

### Breach of Fiduciary Duty – All Funds

110.    Securian and Minnesota Life reallege the foregoing paragraphs.

111.    By virtue of statutory and common law, Wells Fargo owed a fiduciary duty to Minnesota Life and the Series Fund.

112.    Wells Fargo breached its fiduciary duties to Minnesota Life and the Series Fund and thereby caused damages in the form of losses to the General Account, Separate Accounts, and Series Fund, and in the form of fees unjustly charged to Minnesota Life and the Series Fund.

## COUNT V

### Fraud

113.    Securian and Minnesota Life reallege the foregoing paragraphs.

114.    Wells Fargo made numerous misrepresentations to Minnesota Life and the Series Fund intending to induce them to participate in the securities lending program, continue participating in the securities lending program, and refrain from demanding divestiture of Cheyne Finance, Victoria Finance, and Lehman. Wells Fargo's misrepresentations include but are not limited to misrepresentations that the securities lending program would invest and had invested only in safe, liquid investments; that the securities lending pool's investments would and did mirror the investments in a money market fund; and that Wells Fargo had investigated and come to an informed conclusion that investments in Cheyne Finance, Victoria Finance, and Lehman were safe and should be held to maturity.

115.    Wells Fargo also knowingly and intentionally omitted material information in communications with Minnesota Life and the Series Fund, where Wells Fargo knew or should have known that they were relying upon Wells Fargo to be forthright and candid in its assessment of the safety of the securities lending program and the quality of that program's investments. Among other things, Wells Fargo failed to inform Minnesota Life or the Series Fund of the fact that Wells Capital had advised Wells Fargo's money market portfolios to eliminate their investments in Cheyne Finance, Victoria Finance, and Lehman long before any of those entities failed or their securities lost market value.

116.    Wells Fargo's misrepresentations were material to Minnesota Life's and the Series Fund's decisions to participate and continue participating in the securities lending program, and to refrain from demanding divestiture of Cheyne Finance, Victoria Finance, and Lehman.

117.    Wells Fargo made these misrepresentations knowing and intending that Minnesota Life and the Series Fund would rely upon them and be induced to act by them.

118.    Wells Fargo knew these misrepresentations to be false at the time they were made, or it made these misrepresentations with reckless disregard for their truth, or it asserted these facts without knowing whether they were true.

119.    Minnesota Life and the Series Fund reasonably relied upon these misrepresentations.

120.    As a result, Minnesota Life and the Series Fund suffered damages in the form of losses to the General Account, Separate Accounts, and Series Fund.

## COUNT VI

### Negligent Misrepresentation

121.    Securian and Minnesota Life reallege the foregoing paragraphs.

122.    Wells Fargo made numerous misrepresentations to Minnesota Life and the Series Fund under circumstances where Wells Fargo knew or reasonably should have known that Minnesota Life and the Series Fund were relying upon the truth and completeness of Wells Fargo's misrepresentations in determining whether they would participate in the securities lending program, continue participating in the securities lending program, and refrain demanding divestiture of Cheyne Finance, Victoria Finance, and Lehman. Wells Fargo's misrepresentations include but are not limited to misrepresentations that the securities lending program would invest and had invested only in safe, liquid investments; that the securities lending pool's investments would and did mirror the investments in a money market fund; and that Wells Fargo had investigated and come to an informed conclusion that the investments in Cheyne Finance, Victoria Finance, and Lehman were safe and should be held to maturity.

123.    Wells Fargo also omitted material information in communications with Minnesota Life and the Series Fund, where Wells Fargo knew or should have known that they were relying upon Wells Fargo to be forthright and candid in its assessment of the safety of the securities lending program and the quality of that program's investments. Among other things, Wells Fargo failed to inform Minnesota Life or the Series Fund of the fact that Wells Capital had advised Wells Fargo's money market portfolios to

eliminate their investments in Cheyne Finance, Victoria Finance, and Lehman long before any of those entities failed or their securities lost market value.

124.   Wells Fargo's misrepresentations were material to Minnesota Life's and the Series Fund's decisions to participate and continue participating in the securities lending program, and to refrain from demanding divestiture of investments in Cheyne Finance, Victoria Finance, and Lehman.

125.   Wells Fargo made these misrepresentations under circumstances where it knew or should have known that Minnesota Life and the Series Fund would rely upon them and be induced to act by them.

126.   Wells Fargo knew or with reasonable diligence should have known these misrepresentations to be false at the time they were made, and it made these misrepresentations with gross negligence and reckless disregard for their truth.

127.   Minnesota Life and the Series Fund reasonably relied upon these misrepresentations.

128.   As a result, Minnesota Life and the Series Fund suffered damages in the form of losses to the General Account, Separate Accounts, and Series Fund.

## COUNT VII

### Negligence

129.   Securian and Minnesota Life reallege the foregoing paragraphs.

130.   At all times relevant to this Complaint, Wells Fargo owed Minnesota Life and the Series Fund a duty to exercise reasonable care, skill and diligence.

131.    By the conduct, practices and activities described in this Complaint, Wells Fargo failed to exercise reasonable care, skill, and diligence in managing the securities lending program, selecting suitable investments, and determining whether to hold particular investments.

132.    Wells Fargo's conduct constituted bad faith, gross negligence, willful misconduct and reckless disregard of its duties to Minnesota Life and the Series Fund.

133.    As a result, Minnesota Life and the Series Fund suffered damages in the form of losses to the General Account, Separate Accounts, and Series Fund.

## COUNT VIII

### Minnesota Prevention of Consumer Fraud Act
### Minn. Stat. §§ 325F.68 – 325F.695

134.    Securian and Minnesota Life reallege the foregoing paragraphs.

135.    Wells Fargo used fraud, false pretenses, false promises, misrepresentations, misleading statements, and/or deceptive practices, with the intent that Minnesota Life and the Series Fund rely thereon in connection with the sale of its securities lending program and related services and intangibles.

136.    Wells Fargo intended that Minnesota Life and the Series Fund rely upon its fraudulent statements, false pretenses, false promises, misrepresentations, misleading statements, and/or deceptive practices.

137.    Wells Fargo has therefore violated Minn. Stat. § 325F.69, subd. 1.

138.    As a result, Minnesota Life and the Series Fund suffered damages in the form of losses to the General Account, Separate Accounts, and Series Fund.

139. Wells Fargo's violations of the law are ongoing.

140. This litigation serves the public interest. Among other things, the public, including Wells Fargo's other clients and the shareholders and investors in those other clients, will benefit if the Court issues injunctive relief that prevents Wells Fargo from continuing to engage in fraud and deceptive practices, including false and misleading advertisements and promotions for financial services. The public has an interest in preventing the loss of securities that are set aside to fund millions of life insurance and annuity policies due to fraud, negligence, and mismanagement. In addition, the present litigation will shed additional light upon the fraudulent statements, false pretenses, false promises, misrepresentations, misleading statements, and/or deceptive practices Wells Fargo used to promote and support its securities lending program. Holding Wells Fargo accountable for its unlawful conduct will deter other would-be wrongdoers from using similar fraudulent statements, false pretenses, false promises, misrepresentations, misleading statements, and/or deceptive practices to profit from unsuspecting investors.

141. By reason of Wells Fargo's violations of Minn. Stat. § 325F.69, and pursuant to Minn. Stat. § 8.31, Minnesota Life and the Series Fund demand compensatory damages in the form of reimbursement of losses to the General Account, Separate Accounts, and Series Fund; return of all fees paid to Wells Fargo during the life of the securities lending program; attorneys' fees and costs incurred in this action; injunctive and equitable relief, and such other remedies as the Court may deem just and appropriate under the circumstances.

## COUNT IX

### Unlawful Trade Practices
### Minn. Stat. § 325D.13

142.   Securian and Minnesota Life reallege the foregoing paragraphs.

143.   Wells Fargo knowingly misrepresented the true quality of the securities lending program and the collateral investments within that program.

144.   As a result, Minnesota Life and the Series Fund suffered damages in the form of losses to the General Account, Separate Accounts, and Series Fund.

145.   Wells Fargo's violations of the law have also harmed the public, and this litigation serves a public benefit.

146.   By reason of Wells Fargo's violations of Minn. Stat. § 325D.13, and pursuant to Minn. Stat. § 8.31, Minnesota Life and the Series Fund demand compensatory damages in the form of reimbursement of losses to the General Account, Separate Accounts, and Series Fund; return of all fees paid to Wells Fargo during the life of the securities lending program; attorneys' fees and costs incurred in this action; injunctive and equitable relief, and such other remedies as the Court may deem just and appropriate under the circumstances.

## COUNT X

### Deceptive Trade Practices
### Minn. Stat. § 325D.44

147.   Securian and Minnesota Life reallege the foregoing paragraphs.

148.   Wells Fargo used deceptive misrepresentations or designations of geographic origin in connection with goods or services, including deceptive

misrepresentations regarding the geographic origin of securities issuers such as Cheyne Finance and Victoria Finance, in violation of Minn. Stat. § 325D.44, subd. 1(4).

149.    Wells Fargo represented that the services it provided to participants in the securities lending program and the collateral investments within that program had qualities, characteristics, uses, or benefits that they did not have, in violation of Minn. Stat. § 325D.44, subd. 1(5).

150.    Wells Fargo represented that the services it provided to participants in the securities lending program and the collateral investments within that program were of a particular standard, quality, or grade that they did not in fact possess, in violation of Minn. Stat. § 325D.44, subd. 1(7).

151.    Wells Fargo advertised and promoted services related to the securities lending program with the intent not to deliver the services as advertised, in violation of Minn. Stat. § 325D.44, subd. 1(9).

152.    Wells Fargo engaged in other conduct relating to the services it provided to participants in the securities lending program and relating to collateral investments within that program that created a likelihood of confusion or misunderstanding, in violation of Minn. Stat. § 325D.44, subd. 1(13).

153.    As a result, Minnesota Life and the Series Fund suffered damages in the form of losses to the General Account, Separate Accounts, and Series Fund.

154.    Wells Fargo willfully engaged in conduct in violation of Minn. Stat. § 325D.44 knowing it to be deceptive.

155.    Wells Fargo's violations of the law have also harmed the public, and this litigation serves a public benefit.

156.    By reason of Wells Fargo's violations of Minn. Stat. § 325D.44, and pursuant to Minn. Stat. § 8.31 and § 325D.45, Minnesota Life and the Series Fund demand compensatory damages in the form of reimbursement of losses to the General Account, Separate Accounts, and Series Fund; return of all fees paid to Wells Fargo during the life of the securities lending program; attorneys' fees and costs incurred in this action; injunctive and equitable relief, and such other remedies as the Court may deem just and appropriate under the circumstances.

## JURY TRIAL DEMAND

157.    Plaintiff demands a trial by jury on all counts so triable.

## PRAYER FOR RELIEF

WHEREFORE, Securian and Minnesota Life pray for judgment in their favor and against Wells Fargo as follows:

a.   An award of damages in an amount exceeding $75,000 to be determined at trial;

b.   A declaration that Wells Fargo has engaged in consumer fraud, unlawful trade practices, and deceptive trade practices in violation of the laws of the State of Minnesota;

c.   An order disgorging all of Wells Fargo's profits from Minnesota Life's and the Series Fund's participation in the securities lending program;

d.  An award of all the attorneys' fees and costs incurred in this action, pursuant to Minn. Stat. § 8.31;

e.  An award of just and proper equitable and injunctive relief, including but not limited to an order requiring Wells Fargo: (1) to cease making false and misleading statements to clients and prospective clients regarding the safety and liquidity of investments in its securities lending program or of any other conservative investment programs; (2) to designate accurately the country of issue or origin of any investment held within securities lending program; and (3) otherwise to comply with contractual and other limitations upon the investments in which it invests collateral in its securities lending program or client assets in any other investment program.

f.  An award of such other and different relief as this Court deems just and proper.

Dated: October 7, 2011.                    GREENE ESPEL P.L.L.P.

                                            *s/ Jeanette M. Bazis*
                                           Jeanette M. Bazis, Reg. No. 255646
                                           Robert J. Gilbertson, Reg. No. 22361X
                                           Mark L. Johnson, Reg. No. 0345520
                                           Kathryn N. Hibbard, Reg. No. 387155
                                           Samuel J. Clark, Reg. No. 388955
                                           200 S. Sixth Street, Suite 1200
                                           Minneapolis, MN 55402
                                           JBazis@GreeneEspel.com
                                           BGilbertson@GreeneEspel.com
                                           MJohnson@GreeneEspel.com
                                           KHibbard@GreeneEspel.com
                                           SClark@GreeneEspel.com
                                           (612) 373-0830

                                           *Attorneys for Plaintiffs Securian Financial
                                           Group, Inc. and Minnesota Life Insurance
                                           Company*