## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Securian Financial Group, Inc., Securian
Holding Company, and Minnesota Life
Insurance Company,

               Plaintiffs,

v.

Wells Fargo Bank, N.A.,

               Defendant.

Civil No. 11-2957 (DWF/HB)

**MEMORANDUM**
**OPINION AND ORDER**

---

Jeanette M. Bazis, Esq., Kathryn N. Hibbard, Esq., Mark L. Johnson, Esq., Megan M. Walsh, Esq., and Robert J. Gilbertson, Esq., Greene Espel PLLP, counsel for Plaintiffs.

Bart H. Williams, Esq., and Manuel F. Cachan, Esq., Munger Tolles & Olson LLP; Elizabeth V. Kniffen, Esq., Daniel J. Millea, Esq., Lawrence T. Hofmann, Esq., Lindsey A. Davis, Esq., Michael R. Cashman, Esq., Richard M. Hagstrom, Esq., and Rory D. Zamansky, Esq., Zelle Hofmann Voelbel & Mason LLP, counsel for Defendant.

---

## INTRODUCTION

This matter is before the Court on the following motions:  (1) Plaintiffs Securian Financial Group, Inc. ("Securian Financial"), Minnesota Life Insurance Company ("Minnesota Life"), and Securian Holding Company's ("Securian Holding") (together, "Securian" or "Plaintiffs") Motion for Partial Summary Judgment (Doc. No. 158); and (2) Defendant Wells Fargo Bank, N.A.'s ("Wells Fargo" or "Defendant") Motion for Partial Summary Judgment (Doc. No. 165).  For the reasons set forth below, the Court denies Securian's motion and denies Wells Fargo's motion.

# BACKGROUND

## I.     The Parties

Minnesota Life is an insurance, pension, and investment products firm that provides its services to individuals and families.  (Doc. No. 123, Third Am. Compl. ("TAC") ¶ 8.)  Minnesota Life is the administrator for a number of accounts, including what it refers to as its "General Account" and "Separate Accounts."  (*See id.* ¶¶ 8, 28, 30.)  Securian Financial is an insurance and financial services firm with over 13 million clients.  (*Id.* ¶ 6; Doc. No. 168 ("First Millea Decl.") ¶ 2, Ex. 6.)  Securian Financial is the parent corporation of Minnesota Life.  (TAC ¶ 6.)  Securian Holding is the parent holding company of Securian Financial.  (*Id.* ¶ 7.)

Advantus Capital Management ("Advantus") is a registered investment adviser and is wholly owned by Securian Financial; Advantus manages certain Securian investment portfolios.  (*Id.* ¶ 9.)  Advantus provided asset management services to Minnesota Life and Securian Holding.  (First Millea Decl. ¶ 2, Ex. 10.)  Advantus has billions of dollars in assets under its management and its professionals have significant experience in the investment industry.  (*Id.*, Ex. 7.)  The Advantus Series Fund, Inc. ("Series Fund") is a registered investment company whose investments backed certain Minnesota Life products and was comprised of multiple investment portfolios.  (TAC ¶ 9.)  Advantus was the investment advisor and manager of the Series Fund's portfolios. (First Millea Decl. ¶ 2, Ex. 8.)

Wells Fargo is a national banking association.[1]  (Doc. No. 124, Answer ("Ans.") ¶ 10.)  Wells Fargo began offering its Securities Lending Program (the "SLP") in 1982.  (*Id.* ¶ 18.)  Through their SLP, Wells Fargo acted as an agent to loan its clients' securities to brokers.  (*Id.* ¶ 14); *see also Blue Cross & Blue Shield of Minn. v. Wells Fargo Bank, N.A.*, Civ. No. 11-2529, 2013 WL 2434838, at *1 (D. Minn. June 4, 2013) ("*BCBS*").  Brokers provide collateral, usually in the form of cash, to the investor/lender while the securities are on loan.  (Ans. ¶ 14.)  Wells Fargo then invests the collateral on behalf of its clients and in a manner consistent with relevant guidelines.  (*See id.* ¶ 14); *see also BCBS*, 2013 WL 2434838, at *1.

## II.      The Program and Investments

Plaintiffs were institutional investor clients of Wells Fargo's SLP.  (TAC ¶ 1; Ans. ¶ 1.)  There is no dispute that the Securian Plaintiffs and Advantus are experienced in a number of types of asset management, including "traditional asset management," but they do not administer any SLPs.  (*See* Hibbard Aff., Ex. 5 ("Moeller Dep.") at 61.)  Wells Fargo marketed the SLP as involving investments in "short term money market instruments" that "maximize[d] earnings, while taking minimal risk."  (Doc. No. 177 ("Hibbard Aff.") ¶ 2, Ex. 2[2] ("Proposal") at WFSECURIAN00083359[3].)  The program

---

[1]      Wells Fargo was previously Norwest Bank Minnesota.  (Ans. ¶ 18.)

[2]      The Court will cite to all exhibits attached to the Hibbard Affidavit as "Hibbard Aff., Ex. X."

[3]      For convenience, the Court will only refer to Securian's Bates numbers by their final six digits.

had the primary goals of principal preservation and liquidity, with yield and return taking a secondary role. (*Id.* at 008358.) The program used professional credit analysis teams that executed these primary goals. (*Id.* at 083342, 083358.) Investments were to be made in accordance with "individual clients' account guidelines," which were built into Wells Fargo's securities lending system. (*Id.* at 008357, 008351.) According to Plaintiffs, the securities lending business is very complex and requires specialized knowledge and processes. (*See* Doc. No. 176 at 2-3 (citing Hibbard Aff., Ex. 1 ("Blount Expert Report") at ¶¶ 38, 41, 49, 61, 65).)

When pitching the SLP specifically to Plaintiffs, Wells Fargo prepared "Advantus Talking Points for August 6th Meeting" ("Talking Points Memo"). (*See* Hibbard Aff., Ex. 6.) The Talking Points Memo addressed risks and safeguards against risk with respect to the SLP. (*Id.*) A Senior Portfolio Manager provided investment expertise at that meeting and addressed investment guidelines and Wells Fargo's compliance. (*Id.*; Doc. No. 161 ("First Ernstene Aff.") ¶ 2, Ex. 6[4] ("Smith Dep.") at 12.)

When parties participate in the SLP, they sign a Securities Lending Agreement ("SLA") that designates Wells Fargo as having sole investment discretion and management responsibilities. (Hibbard Aff., Ex. 3.) Here, Plaintiffs and Wells Fargo entered into a number of SLAs, and Plaintiffs paid Wells Fargo approximately $5 million for its securities lending services. (First Ernstene Aff., Exs. 3-5, 9.) The parties agreed that Wells Fargo would invest cash collateral in accordance with Plaintiffs' specific

---

[4]     The Court will cite to all exhibits attached to the Ernstene Affidavit as "First Ernstene Aff., Ex. X."

investment policy limitations.  (Hibbard Aff., Exs. 2, 8.)  Plaintiffs assert that they fully and reasonably relied on Wells Fargo to operate the SLP in accordance with the parties' SLAs.  (*See* Doc. No. 176 at 10-11 (citing First Ernstene Aff., Exs. 6, 8; Hibbard Aff., Exs. 12-14).)  Advantus monitored and oversaw Wells Fargo in its role providing securities lending services to Plaintiffs.  (*See, e.g.*, First Ernstene Aff., Ex. 9.)  Wells Fargo provided regular certifications to Advantus that it was performing its services in accordance with the requirements and restrictions outlined in the governing documents. For example, Wells Fargo provided signed compliance checklists (*see, e.g.*, *id.*, Exs. 29, 32); signed compliance certifications (*see, e.g.*, *id.*, Ex. 45); and quarterly compliance certifications (*see, e.g.*, *id.*, Ex. 35).  Plaintiffs reviewed and analyzed aspects of these certifications and reports.  (*See, e.g.*, Hibbard Aff., Ex. 15 ("Gunderson Dep.") at 24, 60-68, 174-79.)  Plaintiffs also communicated with Wells Fargo about compliance through questionnaires and other means.  (*See, e.g.*, *id.*, Exs. 16-18.)  Advantus also visited Wells Fargo's operation and requested additional information on occasion.  (*Id.*, Exs. 5, 19-21.)

In this case, the parties entered into the following SLAs:

1.      In February 2000, Minnesota Life and Wells Fargo entered into an SLA relating to Minnesota Life's General Account ("Minnesota Life General SLA").  (First Ernstene Aff., Ex. 3.)

2.      In February 2000, Minnesota Life and Wells Fargo entered into an SLA relating to Minnesota Life's Separate Accounts ("Minnesota Life Separate Accounts

SLA") (*Id.*, Ex. 4) (Minnesota Life General SLA and Minnesota Life Separate Accounts SLA are together, "Minnesota Life SLAs").

3.      In March 2000, Securian Holding and Wells Fargo entered into an SLA ("Securian SLA").  (*Id.*, Ex. 5.)

4.      On June 30, 2000, the Series Fund, Advantus, and Wells Fargo entered into an SLA ("Series Fund SLA").  (*Id.*, Ex. 9.)

The SLAs included a number of investment restrictions and other requirements. The two Minnesota Life SLAs and the Securian SLA included one such restriction in the form of a prohibition on investments "in any obligation, or other evidence of indebtedness of any business entity not organized under the laws of the United States or any state thereof, or the Dominion of Canada . . . ."  (*Id.*, Exs. 3-5 at ¶ 2(f).)

As a registered mutual fund, the Series Fund-related SLA required a Statement of Additional Information ("SAI") and Prospectus filed with the Securities and Exchange Commission ("SEC").  (*See id.*, Ex. 9.)  The SAI delineated the types of investments permitted.  (*Id.*, Ex. 7 ("Adams Dep.") at 226-27 & Ex. 8 ("SAI").)  The Series Fund SLA required compliance with the SAI and Prospectus.  (*See id.*, Ex. 9.)  The SLA also attached Collateral Guidelines.  (*Id.* at Ex. D.)  The SAI, Prospectus, and Collateral Guidelines were to prevail if they conflicted with other standards.  (*Id.*)  Further, the Series Fund SLA allowed for commingling of the participating Series Fund portfolios into a single account ("Joint Accounts") and was approved by the SEC through an "Exemptive Order."  (*Id.*, Exs. 9, 12 ("Exemptive Order").)  Under the Exemptive Order, "[a]ny Short Term Investment made through the Joint Accounts will satisfy the

6

investment policies and restrictions of all Funds participating in that investment."
(Exemptive Order at SFG0000374.)  Thus, the investments needed to satisfy
requirements of all participating portfolios.  According to Plaintiffs, three of the five
portfolios included in the Joint Account were not permitted to invest in asset backed
securities, and two were permitted to do so.  (*See* First Ernstene Aff., Exs. 8, 21, 22.)

Wells Fargo invested certain collateral in securities issued by structured
investment vehicles ("SIVs").  SIVs are described as "investment organizations" that
issue debt instruments, such as medium-term notes ("MTNs") to generate funding to
invest in "various forms of financial assets."  (*See id.*, Ex. 7 ("Adams Dep.").)  Specific
to this case, Wells Fargo invested certain Securian collateral in MTNs issued by the SIVs
Victoria[5] and Cheyne.[6]  First, on September 5, 2006 and November 3, 2006, Wells Fargo
invested Minnesota Life and Securian Holding collateral in MTNs issued by Victoria.
(*Id.*, Ex. 56.)  On April 12, 2007 and July 25, 2007, Wells Fargo invested Series Fund
joint account collateral in MTNs issued by Victoria.  (*Id.*, Ex. 60.)  On approximately
January 10, February 26, and July 10, 2007, Wells Fargo invested Minnesota Life and
Securian Holding collateral in MTNs issued by Cheyne.  (*Id.*, Ex. 67.)  On February 26,
2007, Wells Fargo also invested Series Fund collateral in a Cheyne-issued MTN.  (*Id.*,
Ex. 69.)

---

[5]     Victoria refers jointly to Victoria Finance Ltd. ("Victoria Ltd.") and Victoria
Finance LLC ("Victoria USA").

[6]     Cheyne refers jointly to Cheyne Finance PLC ("Cheyne PLC") and Cheyne
Finance LLC ("Cheyne USA").

Victoria invested assets and engaged in hedging transactions.  (*Id.*, Ex. 49 ("Victoria Offering Circular").)  Victoria Ltd. was previously known as Stanfield Victoria Ltd. and was organized "under the laws of the Cayman Islands."  (*Id.*)  The Victoria Offering Circular includes a section entitled "Certain Considerations Relating to the Cayman Islands."  (*Id.*)  Victoria Ltd. jointly issued debt instruments with its wholly owned Delaware-based subsidiary, Victoria USA.  (*Id.*)  Victoria USA co-issued debt "solely as an accommodation to [Victoria]."  (*Id.*)  According to Bloomberg,[7] Victoria Ltd. is the obligor on the MTNs.  (First Ernstene Aff., Exs. 52-55.)  Bloomberg also lists the United States as the "Country" and "Country of Domicile" for Victoria.  (*Id.*)  Victoria was placed on default status on January 8, 2008, and a Cayman Islands trust took possession of the assets and issued new notes to Victoria investors.  (*Id.*, Exs. 64-65.)

Cheyne was "a special purpose vehicle which was established for the limited purpose of carrying on business as an investment company and issuing asset backed securities."  (*Id.*, Ex. 66 ("Cheyne Information Memorandum") at WFWCRA00443142.) Cheyne PLC was organized under the law of the Republic of Ireland.  (*Id.*)  Cheyne USA was Cheyne's wholly-owned subsidiary.  (*Id.*)  The Cheyne Information Memorandum lists Cheyne USA as the Issuer.  (*Id.* at WFWCRA00443079, WFWCRA00443142.)  The Cheyne Information Memorandum states that "[t]he Notes will be obligations solely of the Issuer and will not be guaranteed by, or be the responsibility of, any other entity including Cheyne Finance PLC . . . ."  (*Id.* at WFWCRA00443079.)  Cheyne USA's

---

[7]    Bloomberg is a well-known industry resource used by those in the industry when making investment decisions.  (*See* Ernstene Aff. ¶ 2, Ex. 50.)

obligations were "limited to the payments received by [Cheyne USA] on the Corresponding Underlying Note," and Cheyne USA had no obligation to issue any Note to an investor unless Cheyne PLC had issued a Corresponding Underlying Note.  (*Id*. at WFWCRA00443100.)  Cheyne USA's "sole business" was "the purchase of Euro Senior Notes from Cheyne Finance PLC and the issuance of U.S. Senior Notes."  (*Id*. at WFWCRA00443142.)  Bloomberg lists Cheyne PLC as the "obligor" on the Cheyne MTNs.  (First Ernstene Aff., Exs. 75-77.)  Bloomberg also lists the United States as the "Country" and "Country of Risk" for Cheyne.  (*Id*.)  On August 28, 2007, Cheyne went into receivership in the United Kingdom.  (*Id.*, Ex. 80.)  In October 2007, the receiver declared that Cheyne could no longer pay its obligations and Cheyne went into enforcement and restructuring proceedings under English law.  (*See id.*, Ex. 15 at 20-22.)

## III.    The Action

In their Third Amended Complaint ("TAC"), Plaintiffs assert the following claims against Wells Fargo:  (1) Breach of Contract – General Account SLA; (2) Breach of Contract – Separate Accounts SLA; (3) Breach of Contract – Securian Holding SLA; (4) Breach of Contract – Series Fund SLA; (5) Breach of Fiduciary Duty; (6) Fraud; (7) Negligent Misrepresentation; (8) Negligence; (9) Violation of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §§ 325F.68-325F.695 (the "MCFA"); (10) Violation of the Unlawful Trade Practices Act, Minn. Stat. § 325D.13 (the "MUTPA"); (11) Violation of the Deceptive Trade Practices Act, Minn. Stat. § 325D.44; and (12) Breach of ERISA Fiduciary Duty.  (TAC ¶¶ 106-79.)  Plaintiffs also seek punitive damages.  (*Id.* ¶ 180.)  Defendant asserts a number of affirmative defenses,

including waiver, and estoppel and ratification, which are relevant to these motions.  (*See* Ans. at Affirmative Defenses ¶¶ 1-64.)

The parties have filed cross motions for summary judgment.  Defendant seeks summary judgment as to Plaintiffs' claims under the MCFA and MUTPA.  (*See generally* Doc. No. 167.)  Plaintiffs seek summary judgment on their breach of contract claims with respect to all investments made in Victoria and Cheyne-issued MTNs.  (*See generally* Doc. No. 160).  Plaintiffs also seek summary judgment as to a number of Defendant's affirmative defenses and entry of a determination on money damages related to Plaintiffs' breach of contract claims.  (*See generally id.*)

## DISCUSSION

### I.    **Legal Standard**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d

at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.   Wells Fargo's Motion

Defendant seeks summary judgment with respect to Plaintiffs' claims under the MCFA and MUTPA on the grounds that Plaintiffs are sophisticated merchants and are therefore barred from bringing such claims.

The MCFA prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise." Minn. Stat. § 325F.69, subd. 1. "Merchandise" includes services. *See id*. § 325F.68, subd. 2. The MUTPA makes it unlawful for any "person . . . , in connection with the sale of merchandise, [to] knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise." *Id*. § 325D.13. "Person" extends to business entities. *See id*. § 325D.10(a). MCFA and MUTPA claims are brought through the Minnesota Private Attorney General Statute, which states that "any person injured by a violation of any of the laws referred to in subdivision 1 may bring a civil action and recover damages." *Id*. § 8.31, subd. 3(a). The MCFA and MUTPA are "generally very

broadly construed to enhance consumer protection." *State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 496 (Minn. 1996).

Both the law and the facts are in dispute with respect to these claims. Defendants argue that the law is "settled" that "merchants" are precluded from bringing MCFA and MUTPA claims. Defendants further assert that it is undisputed that Plaintiffs here are "merchants," that two other courts have held that the specific Plaintiffs in this case are "merchants," and that therefore Plaintiffs cannot bring their MCFA and MUTPA claims.

Plaintiffs, on the other hand, argue that whether "merchants" can pursue claims under the MCFA and MUTPA is not a settled issue. Plaintiffs assert that the controlling Minnesota Supreme Court case on this issue, *Church of the Nativity of Our Lord v. Watpro*, 491 N.W.2d 1 (Minn. 1991), does not include any prohibition against "merchants" for consumer fraud claims. The Court agrees.

Courts examining MCFA and MUTPA claims have indeed distinguished between "merchants" and consumers. *See, e.g.*, *Marvin Lumber & Cedar Co. v. PPG Indus. Inc.*, 223 F.3d 873, 887 (8th Cir. 2000) (citing the Minnesota Supreme Court, which "in examining how consumer protection statutes can co-exist with the U.C.C., . . . drew a sharp distinction between commercial parties and consumers"); *see also Pugh v. Westreich*, No. A04-657, 2005 WL 14922, at *3 (Minn. Ct. App. Jan. 4, 2005) (stating that "[t]he MCFA protects consumers, as opposed to sophisticated investors or merchants") (citing *Ly v. Nystrom*, 615 N.W.2d 302, 309 (Minn. 2000)). Further, in some scenarios, Minnesota courts have precluded "merchants" from bringing MCFA and MUTPA claims. *See, e.g.*, *Tisdell v. ValAdCo*, No. C0-01-2054, 2002 WL 31368336, at

12

*10-11 (Minn. Ct. App. Oct. 16, 2002) (holding that plaintiffs were not consumers within the context of the transactions at issue and were precluded from bringing their claims under the MCFA) (citing *Watpro*, 491 N.W.2d at 7); *see also Marvin Lumber*, 223 F.3d at 887-88 (concluding that Minnesota's false advertising statute did not apply to the plaintiff who was determined to be a merchant with respect to window treatments).

However, the Minnesota Supreme Court has not issued a blanket prohibition on merchants for all MCFA or MUTPA claims, through *Watpro* or any other case, and in some cases, courts have allowed merchants to pursue those claims. *See, e.g.*, *Workers' Comp. Reins. Ass'n v. Wells Fargo Bank, N.A.*, Civ. No. A11-1260, 2012 WL 1253094 (Minn. Ct. App. Apr. 16, 2012) (allowing non-profits with large investment portfolios to pursue claims). In fact, in examining *Watpro*, the Minnesota Supreme Court specifically stated that, "[w]e observed that the CFA is not expressly limited to individual consumers and has not been interpreted that way by the courts." *Ly*, 615 N.W.2d at 309. Instead, courts focus their analysis on whether a party can be considered a sophisticated merchant in the specific skills or goods at issue, and only those parties that are in fact deemed to be sophisticated merchants in the specific skills or goods at issue have been precluded from asserting Minnesota consumer claims.

For example, in *Ly*, the court held that the plaintiff, a restaurant owner, was acting as a consumer, not a sophisticated merchant, when he purchased a restaurant business, even though the plaintiff was a "veteran of the restaurant business" and was likely to be considered a merchant for purposes of other transactions. *Id*. at 310. Similarly, in *Marvin*, the Court of Appeals for the Eighth Circuit held that the plaintiff was "a

13

merchant with respect to window treatments." *Marvin*, 223 F.3d at 887.  In *Marvin*, the plaintiff specialized in the manufacture and sale of custom-made wooden doors and windows.  *Id.* at 875.  The dispute in *Marvin* involved claims that the defendant's products did not meet the plaintiff's expectations in preventing wood rot and deterioration in its doors and windows.  *Id.*  Thus, window treatments—part of the plaintiff's specialty as a manufacturer of doors and windows—were at issue in the case. Even in *Tisdell*, relied upon by Defendant in this case, the court held that the plaintiffs were merchants and were "not consumers within the context of *these transactions*." *Tisdell*, 2002 WL 31368336, at *10 (emphasis added).  The *Tisdell* plaintiffs had previously sold farm products and had invested in that area on a large scale.  *Id.*  The court therefore found that they were more than ordinary consumers when it came to share purchases in a hog breeding and farm facility.  *Id.* at *10-11.  Thus, the question at issue here is whether Plaintiffs are in fact considered sophisticated merchants with respect to the transactions at issue and to a degree that would preclude them from being covered by the consumer fraud statutes.

Defendant argues that it is clear that Plaintiffs are merchants as a matter of law. Defendant points to Plaintiffs' roles as financial companies and insurance institutions that serve millions of clients in financial matters.  Defendant further argues that Plaintiffs have imputed expertise as clients of Advantus, which undoubtedly specializes in financial transactions such as the one at issue here.  Plaintiffs, however, argue that Defendant is not entitled to summary judgment because a jury could reasonably conclude that Plaintiffs

were not "merchants" based on a number of disputed facts about the sophistication and skills Plaintiffs and Advantus hold.  The Court again agrees.

Although Plaintiffs will undoubtedly have an uphill battle convincing a jury of their lack of sophistication, they still present sufficient facts upon which a reasonable jury could rely to conclude that Plaintiffs were not sophisticated merchants in matters of securities lending.  Again, to be a sophisticated merchant, a party must have knowledge or skill particular to the practices involved in the transaction at issue.  *See* Minn. Stat. § 336.2-104(1).  Being sophisticated in certain matters does not necessarily make one a sophisticated merchant in all matters.  *See, e.g.*, *Kinetic Co. v. Medtronic, Inc.*, 672 F. Supp. 2d 933, 946 n.8 (D. Minn. 2009) ("[T]he Court does not doubt [plaintiff] is sophisticated in its regular business dealings.  But this is the purchase of a complex medical device.  [Plaintiff] does not deal in such goods nor hold itself out as having special knowledge or skill in [that] business . . . the Court easily finds [plaintiff] is not a "merchant," [for purposes of the MCFA]."); *see also Minnesota Forest Prods., Inc. v. Ligna Mach., Inc.*, 17 F. Supp. 2d 892, 905-06 (D. Minn. 1998) (finding that a genuine issue of material fact existed with respect to whether the plaintiff was sophisticated in certain aspects of the sawmill business).  Here, Plaintiffs point to evidence that supports the view that they never held themselves out as having special skills or knowledge with respect to the securities lending business.  Plaintiffs present expert opinion that securities lending is a highly complex business that involves complex services, processes, and monitoring.  Plaintiffs further present evidence that, due to this complexity, they did not have the mechanisms for managing securities lending and also gave management

15

discretion entirely to Wells Fargo for their investments.  Plaintiffs also present evidence that Wells Fargo agreed that Plaintiffs were not sophisticated in this area through Wells Fargo's marketing materials to Plaintiffs that detailed the program and the risk safeguards they provide.  This presents a question of fact for a jury.

Further, this case is distinguishable from the two cases cited by Defendant involving the same Plaintiffs as here.  In those cases, the dispute related to Plaintiffs' purchases of residential mortgage-backed securities ("RMBS").  *See Minnesota Life Ins. Co. v. Credit Suisse First Boston Mortg. Secs. Corp.*, 62-cv-12-7339 (Ramsey County District Court, Nov. 13, 2013) (located at Doc. No. 168-1 in this matter); *see also Minnesota Life Ins. Co. v. Countrywide Fin. Corp.*, Civ. No. 12-6149, 2012 WL 6742119 (C.D. Cal. Dec. 6, 2012).  There is no dispute that Plaintiffs are sophisticated merchants when it comes to RMBS purchases.  However, that is not the case here.

In sum, Plaintiffs have presented sufficient facts to establish that genuine issues of material fact exist regarding whether they were sophisticated merchants with respect to securities lending.  Thus, Defendant's motion for summary judgment on Plaintiffs' consumer claims is denied.[8]

## III.    Plaintiffs' Motion

### A.    Breach of Contract

Plaintiffs assert that Wells Fargo breached the SLAs as a matter of law when it invested Plaintiffs' collateral in debt obligations of Victoria and Cheyne.

---

[8]      The Court does not find *Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2 (Minn. 2001) to be on point to the specific issue presented here.

To state a breach of contract claim, a plaintiff must show:  "(1) formation of a contract; (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant; and (3) breach of the contract by defendant."  *Watkins Inc. v. Chilkoot Distrib., Inc.*, 719 F.3d 987, 991 (8th Cir. 2013) (quoting *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011)).  With respect to breach of contract,

> [i]t is generally recognized that summary judgment is not appropriate where the terms of a contract are at issue and any of its provisions are ambiguous or uncertain.  Under such circumstances, the trial court should allow the parties a full opportunity to present evidence of facts and circumstances and conditions surrounding its execution and the conduct of the parties relevant thereto.

*Donnay v. Boulware*, 144 N.W.2d 711, 716 (Minn. 1966); *see also Barry v. Barry*, 78 F.3d 375, 382 (8th Cir. 1996).  A contract is ambiguous if its language is reasonably susceptible to more than one interpretation.  *Barry*, 78 F.3d at 382 (citing *Bd. of Regents of Univ. Minn. v. Royal Ins. Co. of Am.*, 517 N.W.2d 888, 892 (Minn. 1994).  However, absent ambiguity, the terms of a contract are to be given their plain and ordinary meaning and are not considered ambiguous simply because the parties dispute their interpretation.  *See Knudsen v. Transp. Leasing/Contract, Inc.*, 672 N.W.2d 221, 223 (Minn. Ct. App. 2003).

Here, the parties focus their dispute on the third element—whether Wells Fargo breached the SLAs.  Plaintiffs assert that because the facts demonstrating Wells Fargo's breach are undisputed, summary judgment should be granted.  Defendant asserts that there is a clear dispute of material fact.

### i.      Geographical Restrictions

Plaintiffs first assert that Defendant breached Section 2(f) of the Minnesota Life and Securian SLAs, which restrict collateral investments such that "no investment shall be made under this paragraph in any obligation, or other evidence of indebtedness of any business entity not organized under the laws of the United States or any state thereof, or the Dominion of Canada thereof . . . ."  (First Ernstene Aff., Exs. 3, 4, 5.)  Specifically, Plaintiffs argue that the provision prohibiting relevant entities from being "not organized under the laws of the United States" is wholly unambiguous and that Wells Fargo's investments in the Victoria and Cheyne MTNs were direct violations of that provision because the Victoria and Cheyne MTNs are "obligations of" Victoria Ltd. and Cheyne PLC, which were "organized under the laws of" the Cayman Islands and Ireland, respectively, and not "under the laws of the United States."

On the other hand, Wells Fargo argues that there is a factual dispute relating to which laws Victoria and Cheyne were organized under.  First, Wells Fargo points to the fact that Victoria and Cheyne had United States-organized "co-issuers" to support its argument that which laws Victoria and Cheyne were "organized under" is a fact dispute. According to Wells Fargo, the "issuer" is the focus for examining which laws Victoria and Cheyne were "organized under."  Further, Wells Fargo argues that for a security to be "foreign," the issuer must be domiciled somewhere other than the United States. Thus, Wells Fargo argues that because Victoria USA and Cheyne USA are issuers that are organized under Delaware law, there is no breach.  Second, Wells Fargo argues that because the MTNs were co-issued, they were issued at least partially under the laws of

the United States and that, therefore, there is a reasonable dispute about the meaning of
provision 2(f).

Plaintiffs counter that the United States-based co-issuers—Victoria USA and
Cheyne USA—were "empty shells with no assets, liabilities, or activities, and with the
sole purpose of issuing notes on which foreign entities would be the ultimate and sole
obligors." (Doc. No. 160 at 19.)  Plaintiffs argue that Defendant's analysis erroneously
focuses on the "issuer" for determining the relevant entity and the laws it was organized
under because provision 2(f) makes no reference to the "issuer."  Instead, Plaintiffs argue
that the Court should focus on the "obligor" for the notes because provision 2(f) refers to
"obligations or other evidence of indebtedness."  According to Plaintiffs, this means that
the Court should focus on Victoria Ltd. and Cheyne PLC.

The Court concludes that provision 2(f) is overall ambiguous.  Two main aspects
of the provision are ambiguous:  (1) the extent to which the parties intended to restrict
foreign entity involvement; and (2) which entity or entities the "obligations or other
evidence of indebtedness" were "of."  The Court addresses each issue in turn.

As to the first issue, while it is the case that the provision prohibits foreign entity
involvement in some capacity, the scope of that prohibition is ambiguous.  The parties
fail to present argument regarding their intent in including provision 2(f).  It is not
disputed that Plaintiffs specifically requested that the provision be added, yet there is no
evidence showing what they understood the provision to mean at that time.  (Doc.
No. 172 ("Third Millea Aff.") ¶ 2, Exs. 7, 8 & 9.)  Certainly provision 2(f) shows on its
face that the parties agreed to address the involvement of foreign-organized entities to

some degree.  In fact, on its face, the provision explicitly focuses on restricting non-U.S.

entities (i.e. foreign entities) by stating "no investment shall be made . . . in any

obligation . . . of any business entity not organized under the laws of the United States."

Wells Fargo's contention that provision 2(f) "on its face . . . clearly requires that

investments have a U.S. or U.S. state issuer," is mistaken.  By disallowing obligations of

any entity organized under non-U.S. laws, the provision says just the opposite of what

Wells Fargo asserts—the provision prohibits foreign entities in some capacity.  And,

while practically speaking, Wells Fargo is correct that there will be a U.S. entity, the

focus of 2(f) is the degree to which a foreign entity must be excluded.  Thus, the question

is the extent to which foreign entities are prohibited.  On this issue, provision 2(f) is less

clear.  For example, did the parties wish to prohibit *issuers* organized under foreign law

or did they wish to prohibit any foreign entity *involvement*?  Provision 2(f) alone does not

answer these questions.  Thus, what the parties intended to restrict is in dispute and the

Court cannot make a determination as a matter of law.  As a result, the Court concludes

that this aspect of provision 2(f) is ambiguous and cannot be construed at the summary

judgment stage as a matter of law.

As to the second issue, the Court finds that the phrase "obligations or other

evidence of indebtedness of" is also ambiguous.  The phrase "obligations or other

evidence of indebtedness *of*" is not defined by the SLAs.  Thus, which entity or entities

an investment is "of" cannot be determined by reading provision 2(f) or the contract as a

whole.  Put another way, the nature of the investments as they relate to provision 2(f) is

not clear.  For example, does Victoria's co-issuer structure mean that the MTNs were

"obligations or other evidence of indebtedness *of*" both issuers, or does a co-issuer structure mean that the industry considers the MTNs to be "obligations or other evidence of indebtedness *of*" the U.S.-organized entity?  The parties present competing evidence that shows genuine issues of material fact regarding which entity or entities the obligations were "of."  Thus, the parties must present the following issues to a jury: (1) whether, in the case of Victoria, the MTNs[9] were *of* Victoria Ltd., *of* Victoria USA, or *of* both; and (2) whether, in the case of Cheyne, the MTNs were *of* Cheyne PLC, *of* Cheyne USA, or *of* both.

Specifically, with respect to Victoria, the Offering Circular shows that two entities were involved in the issuance of the Victoria MTNs and that they were co-issuers— Victoria Ltd. and Victoria USA.  The Offering Circular repeatedly refers to the two entities as co-issuers and details their joint structure in their program for the issuance of MTNs.  One of these two entities was indisputably "organized under" the laws of the Cayman Islands and one was indisputably "organized under" the laws of Delaware. Defendant's expert viewed the investment in MTNs as investments in "both an obligation of a U.S. entity and an obligation of a non-U.S. entity."  (Doc. No. 180 ("Second Ernstene Aff.") ¶ 2, Ex. 83 ("Glucksman Dep.") at 89.)  Plaintiffs focus on evidence that Victoria USA had no assets, employees, property, offices, or operations in the U.S. and was "effectively some paper" that was "designed to be [a] thinly capitalized entit[y]." (First Ernstene Aff., Exs. 32-33.)  Plaintiffs further point to the Offering Circular in

---

[9]     Provision 2(f) prohibits "*investment* . . . in any obligations . . . of any business entity."  Here, the *investment* was in Victoria and Cheyne MTNs, which are the relevant "obligations or other evidence of indebtedness of" for purposes of this inquiry.

support of their claim that the foreign entity was the sole source of money and the

ultimate payor of all obligations and that Victoria was therefore "of" a foreign entity.

Plaintiffs present evidence that their investment exposed them to risks created by Cayman

Islands law, and placed them outside of the reach of judgments entered by United States

courts. Finally, according to Plaintiffs, the MTNs could not have been issued without

Victoria PLC. On the other hand, Defendant points to industry and custom views that

establish that where there is a co-issuer structure, investments are viewed as being

U.S.-domiciled. Defendant also points to evidence that the co-issuer structure is common

and that under such a structure it is the issuer that matters. Finally, Defendant points to a

number of Bloomberg indicators that show that the U.S. is the relevant domicile for the

investments. In sum, this creates a genuine issue of material fact regarding whether the

investments were "of" *any* foreign entities.

Similarly, with respect to Cheyne, the Court finds that a factual dispute remains.

For the Cheyne MTN program, Cheyne USA was the sole Issuer, and the Information

Memorandum includes a number of statements that focus on Cheyne USA. For example,

as Defendant notes, the first page clearly states: "The Notes will be obligation solely of

the Issuer and will not be guaranteed by or be the responsibility of, any other entity

including Cheyne Finance PLC . . . or any of their respective affiliates." (*Id.*, Ex. 66 at

443079.) Bloomberg lists Cheyne USA as the "Issuer" and "US" as the "Country"

associated with Cheyne. (*Id.*, Exs. 75-77.) Finally, Wells Fargo presents evidence

through their expert testimony that industry custom and practice would view the MTNs

as U.S. obligations. (*See* Doc. No. 173 ("Glucksman Aff.") ¶ 2, Ex. A ("Glucksman

Report") at ¶¶ 22, 108, 122.)  This includes testimony relating to Cheyne's structure and

its corresponding regulatory obligations and their impact on the nature of its investments.

Yet, as Plaintiffs note, the Bloomberg listing refers to Cheyne PLC as the "ultimate payor

and obligor."  Plaintiffs again point to evidence of Cheyne PLC as the only real obligor

on the Notes and Cheyne USA as a mere shell.  Therefore, a jury will have to determine

the nature of the Cheyne MTNs and where they were "of."

     In sum, there are disputes regarding:  (1) the extent to which the parties agreed to

limit foreign-organized entities; and (2) which entities Victoria and Cheyne are

"obligations or other evidence of indebtedness *of*."  Both disputes must be resolved by a

jury.[10]  Therefore, the Court denies Plaintiffs' motion for summary judgment with respect

to Plaintiffs' breach of contract claims based on violations of provision 2(f). [11]

---

[10]     However, the Court does conclude that the specific phrase "organized under" is not ambiguous.  In fact, despite their statements to the contrary, the parties actually appear to agree on the meaning of that phrase because they do not dispute that Victoria Ltd. was "organized under" Cayman Islands law, Victoria USA was "organized under" Delaware law, Cheyne PLC was "organized under" Irish law, and Cheyne USA was "organized under" Delaware law.  There is similarly no dispute that at least one entity involved in the issuance of the relevant MTNs was "organized under" foreign law in both cases—the Cayman Islands for Victoria and the Republic of Ireland for Cheyne.

[11]     Plaintiffs also assert that Wells Fargo breached this provision in other ways.  For example, Plaintiffs argue that Wells Fargo failed to program the geographic restrictions into its computer compliance systems and did not properly monitor compliance with Securian's requirements in other ways.  (Doc. Nos. 160 & 179 (citing *see, e.g.*, First Ernstene Aff., Exs. 58, 60, 62, 71; Hibbard Aff., Ex. 20 ("[T]his is ugly . . . I am reading the guidelines now—says that 'WF agrees' to run the investment according to THEIR guidelines, not according to the EY pool guidelines…. We have some work to do.")).)  These disputed facts are also properly considered by a jury.

###### ii. Investment Restrictions

Plaintiffs argue that Wells Fargo also breached the Series Fund SLA when it invested in Victoria and Cheyne because it failed to meet the requirements of the Collateral Guidelines and the Prospectus and SAI, which prohibited investment in so-called "asset-backed securities."

Plaintiffs' argument requires a number of steps.  First, the Series Fund SLA requires that collateral investments "conform to, and be consistent with both the Collateral Guidelines for Securities Lending . . . and the Fund's then current Prospectus and Statement of Additional Information."  (First Ernstene Aff., Ex. 9.)  Second, the Collateral Guidelines state that if there is a conflict between the Collateral Guidelines and the Prospectus or the SAI, the Prospectus and SAI prevail.  (*Id*. at Ex. D.)  Third, the Exemptive Order relating to the comingled Series Fund investments requires that collateral "satisfy the investment policies and restrictions of all Funds participating in that investment," including the SAI requirements.  (Exemptive Order.)  Finally, the Exemptive Order means that the SAI could not prohibit investments for any of the five participating Series Fund portfolios in order for an investment to be qualifying.  Thus, given the above, Plaintiffs argue that because the SAI only authorized two of the five participating Series Fund portfolios to invest in "asset-backed securities," Wells Fargo breached the SLA and its embraced documents when it invested certain comingled collateral in Victoria and Cheyne, which issued MTNs that Plaintiffs characterize as "asset-backed securities."

Specifically, according to Plaintiffs, because the SAI is controlling, the SAI's definition of "asset-backed securities" is also controlling.  That definition provides that securities issued "in the form of debt instruments . . . as the debt of a special purpose entity organized solely for the purpose of owning such assets and issuing such debt," where the special purpose entity "generally hold[s] no assets other than those underlying the asset-backed securities and any credit support provided" are asset-backed securities. (*Id.*, Ex. 8 ("SAI").)  Plaintiffs assert that the investments in Victoria and Cheyne fit squarely within this definition.

Wells Fargo, however, vigorously disputes Plaintiffs' view that the Victoria and Cheyne MTNs could be considered "asset-backed securities."  According to Wells Fargo, reasonable professionals view MTNs as falling outside of the definition of "asset-backed securities."  Further, Wells Fargo argues that experts and industry custom and practice generally view MTNs issued by SIVs as not being asset-backed securities, but instead they are financial instruments separate and distinct from asset-backed securities.  (*See* Glucksman Report ¶¶ 63-74.)  Specifically, Wells Fargo's expert, Glucksman, explains that SIV MTNs "are not completely dependent on the cash flow of self-liquidating assets; rather, the SIV expects to sell certain assets in order to achieve certain gain on sale from appreciating assets, avoid or limit losses on sale, or sell certain assets in order to maintain required liquidity levels."  (*See id.* n.54.)

Although Wells Fargo's argument calls into question whether the Victoria and Cheyne MTNs are "asset-backed securities" per industry custom and usage, it fails to address the actual question before the Court.  Plaintiffs are correct that the SAI's

definition must be considered first here.  Thus, the question at issue is whether the

Victoria and Cheyne MTNs were "in the form of debt instruments, also known as

collateralized obligations, . . . [and were] generally issued as the debt of a special purpose

entity organized solely for the purpose of owning such assets and issuing such debt,"

where the special purpose entity "generally hold[s] no assets other than those underlying

the asset-backed securities and any credit support provided."  (SAI.)[12]

Based on the SAI definition, it appears that the MTNs were debt instruments,

which the parties do not appear to dispute.  Second, the MTNs were the debt of a special

purpose entity organized for the purpose of owning assets and issuing debt as outlined in

the SAI definition.  Victoria Ltd.'s business was to issue debt instruments and to invest in

and hold assets that backed those debt instruments.  (*See* Victoria Offering Circular.)

Similarly, Cheyne PLC's business was to issue notes and hold Corresponding Underlying

Notes issued by Cheyne, whose business was to invest in assets that backed those

Corresponding Underlying Notes.  (*See* Cheyne Offering Memo.)  Finally, Victoria and

Cheyne did not hold other assets separate from this purpose.

Nevertheless, Defendant's argument has merit.  First, Plaintiffs' expert testified

that an argument exists that the MTNs here do not fall inside this definition.  (Third

Millea Aff. ¶ 2, Ex. 12 at 325-28.)  This shows a genuine dispute of material fact.

Second, it is true that there is a fact dispute regarding whether the Victoria and Cheyne

---

[12]     The parties do not appear to dispute that guidelines for two of the five portfolios
prohibited "asset-backed securities" investments or that collateral associated with those
two portfolios which prohibited "asset-backed securities" investments were in fact
invested in Victoria and Cheyne MTNs.

SIV MTNs are "asset-backed securities" based on whether the parties involved in this case and those in the industry view them as such.  The parties present evidence that there are a number of views on this issue, including as it relates to the SAI definition.  Moreover, with the multitude of governing documents, overlapping phrases, and industry practices, the Court concludes that this provision cited by Plaintiffs is ambiguous.  The section relating to asset-backed securities offers a number of possible definitions and types of products that constitute asset-backed securities.  Furthermore, the provision cited by Plaintiffs uses the word "generally" two times.  Generally implies a typical, but not exclusive, understanding.  Again, both Plaintiffs and Wells Fargo present statements by each of their experts in support of their views regarding whether MTNs like the ones issued here are considered asset-backed securities.  (Third Millea Aff. ¶ 2, Ex. 12 at 325-28 ("I would not expect to see SIV issuances being referred to as [ABS]."); Glucksman Report at ¶¶ 54 n.64, 63-74 (opining that MTNs are distinct from asset backed securities and explaining why they fail to fall within Plaintiffs' definition).)  What is before the Court here is essentially a battle of experts, which is best considered by a jury.[13]  Thus, Plaintiffs' motion for summary judgment is denied.

---

[13]    Wells Fargo also asserts that the SLA explicitly permitted investments in "securities of other investment companies," thereby making Victoria and Cheyne satisfy the SLA requirements.  Plaintiffs counter that the SLA makes clear that "investment companies" actually refers to "mutual funds," and that the SAI makes clear that it includes money market funds and traded funds—none of which are SIVs.  Plaintiffs also counter that Victoria and Cheyne exclude themselves from the definition of "investment company" in their offering documents.  Because the Court finds the provision ambiguous, it need not address these additional arguments here.

### B.     Affirmative Defenses

Wells Fargo asserts waiver, estoppel and ratification as affirmative defenses to Plaintiffs' claims, among others.  Wells Fargo bears the burden of proof on its affirmative defenses, and Plaintiffs need not disprove them to prevail on summary judgment. *Residential Funding Co., LLC v. Terrace Mortg. Co.*, 850 F. Supp. 2d 961, 964 (D. Minn. 2012) (citing *Lackawanna Chapter of Ry. & Locomotive Hist. Soc'y, Inc. v. St. Louis Cnty., Mo.*, 606 F.3d 886, 888 (8th Cir. 2010) (additional citation omitted)).

With respect to ratification, under Minnesota law, a "party may be estopped from challenging an act unauthorized by a contract when the party has ratified the act." *Logan v. Northwest Bank Minn., N.A.*, 603 N.W.2d 659, 664 (Minn. Ct. App. 1999) (citation omitted).  Ratification occurs when a party, with "full knowledge of all the material facts, confirmed, approved, or sanctioned, by affirmative act or acquiescence, the originally unauthorized act of another." *Wildung v. Bank of New York Mellon*, Civ. No. A13-1530, 2014 WL 1758305, at *2 (Minn. Ct. App. May 5, 2014) (citing *Anderson v. First Nat'l Bank of Pine City*, 228 N.W.2d 257, 259 (Minn. 1975)).  A "[p]arty cannot be estopped by ratification unless the party sought to be estopped had full knowledge of the facts at the time of the conduct claimed to give rise to the estoppel." *Logan*, 603 N.W.2d at 664 (citations omitted).

Similarly, for waiver, a party must show "the intentional relinquishment of a known right," which may be inferred from party conduct. *Valspar Refinish, Inc. v. Gaylord's Inc.*, 764 N.W.2d 359, 367 (Minn. 2009) (citations omitted).  Both ratification and waiver are questions of fact based on an examination of the parties' conduct and

knowledge.  *See, e.g.*, *Logan*, 603 N.W.2d at 664-65; *see also Valspar*, 764 N.W.2d at 367.

Plaintiffs argue that because this Court should grant summary judgment on its breach of contract claims, it should also grant summary judgment against Defendant's affirmative defenses.  Wells Fargo argues that there is more than sufficient evidence for a rational jury to conclude that the relevant investments were ratified and that the investments violated the SLAs were waived.  The Court agrees.

Evidence exists that could allow a reasonable fact-finder to conclude that Plaintiffs, through Advantus, ratified the purchases of Victoria and Cheyne MTNs and that Plaintiffs waived their right to claim the purchases violated the contracts.  What Plaintiffs, through Advantus or otherwise, had "full knowledge of"[14] is in dispute.  Wells Fargo presents evidence that Advantus received monthly collateral investment reports, which included information about holding Victoria and Cheyne.  (*See* Third Millea Aff. ¶ 2, Exs. 17-20.)  Further, according to Wells Fargo, Advantus certified that the transactions were in compliance with Securian guidelines and were consistent with Securian investment objectives.  (*See, e.g.*, *id.*, Exs. 39-41.)  Documents received by Advantus could show that Advantus knew Victoria was registered in the Cayman Islands, and that it was a SIV.  Plaintiffs counter that they fully relied on Wells Fargo to comply with investment restrictions and that they further relied on Wells Fargo's regular representations that it was so complying.  Plaintiffs point to a number of Wells Fargo

---

[14]     Because both waiver and ratification have knowledge requirements, the Court considers the two affirmative defenses together in its analysis.

29

certifications that it was conducting compliance checks and was certifying its compliance and monitoring activities.  Plaintiffs argue that although they admit to receiving collateral-holdings reports that include information about investments in the Victoria and Cheyne MTNs, they did not have "full knowledge" about those investments because they used them for purposes that would not have allowed them to have in-depth knowledge of the nature of the investments.  These facts, however, do not demonstrate that Wells Fargo's defense fails as a matter of law and do no overcome the genuine issue of material fact created by the competing evidence.  As a result, Plaintiffs' summary judgment motion on Wells Fargo's affirmative defenses is denied.

### C.      Money Damages

Plaintiffs seek a determination regarding money damages for those claims on which it prevails in its summary judgment motion.  Given the Court's determinations above denying summary judgment on Plaintiffs' breach of contract claims and Defendant's affirmative defenses, the Court declines to make a determination on any portion of damages at this time.

### D.      Wells Fargo's Previously Withdrawn Defenses

Plaintiffs assert that the defenses withdrawn by Wells Fargo in a prior case on the same subject matter are no more applicable here than in those cases and should therefore be dismissed.  Plaintiffs further assert that when this Court determined that Plaintiffs had adequately stated a claim in a prior case, then the same affirmative defenses cannot be

allowed to proceed here.[15]  The Court disagrees with both assertions.  First, Plaintiffs'

argument that the defenses did not move forward in another case fails to meet Plaintiffs'

burden of demonstrating that the affirmative defenses fail as a matter of law, or have the

absence of a genuine issue of material fact in this case.  Second, Wells Fargo has not

agreed to withdraw any affirmative defenses in this case, and this Court has not

specifically ruled on the elements of the underlying claims here.  Plaintiffs' motion that

certain affirmative defenses be dismissed is therefore denied.

## CONCLUSION

Genuine issues of material fact exist with respect to Plaintiffs' following claims:

MCFA, MUTPA; and breach of contract for investments Victoria and Cheyne.  Summary

judgment is denied as to those claims.  Summary judgment is also denied with respect to

Plaintiffs' request to dismiss a number of Defendant's affirmative defenses.  Finally, the

Court declines to determine damages at this time.  The Court adds that in light of the

numerous previous related cases, settlement is likely in the best interest of the parties in

this matter.

## ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED**

that:

1.      Wells Fargo's Motion for Partial Summary Judgment (Doc. No. [165]) is

**DENIED**.

---

[15]     Plaintiffs appear to include at least the following affirmative defenses:  Nos. 6, 7, 16, 32, 34-36, 39, 40-42, 44-46, and 49-51.  (Doc. No. 160 at 25 n.102 & 26 n.104.)

2.      Plaintiffs' Motion for Summary Judgment (Doc. No. [158]) is **DENIED**.


Dated:  December 8, 2014                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge